295 N.J. Super. 354 (1996)
685 A.2d 49
BRANDON CANESI, A MINOR BY HIS PARENTS, MELISSA AND SEBASTIAN CANESI, AS GUARDIAN AD LITEM; MELISSA AND SEBASTIAN CANESI, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
JAMES A. WILSON, M.D., RONALD LOWE, M.D., JOHN DOE PHYSICIAN (2-10), JOHN DOE DRUG MANUFACTURER (1-10), DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 7, 1996.
Decided November 27, 1996.
*355 Before Judges SHEBELL, BAIME and PAUL G. LEVY.
*356 Jay L. Hundertmark argued the cause for appellants (Valore Law Firm, attorneys; Mr. Hundertmark, of counsel, and on the brief).
Robert E. Paarz argued the cause for respondents (Paarz, Master & Koernig, attorneys; Mr. Paarz, of counsel; Mary Ann O'Brien, on the brief).
Orlovsky, Grasso & Bolger, filed a brief on behalf of defendant-respondent, Robert E. Loewe, M.D. (Donald J. Grasso, of counsel; Nina M.C. Halpin, on the brief).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
Plaintiffs appeal the dismissal by summary judgment of their medical malpractice action. On December 21, 1992, plaintiffs filed suit against defendant, Dr. James Wilson, alleging medical malpractice. On March 4, 1994, plaintiffs filed an amended complaint that added Dr. Ronald Loewe[1] as a defendant. On September 1, 1995, defendant, Dr. Wilson, moved for summary judgment. Defendant, Dr. Loewe, subsequently joined in the motion. The judge granted defendants' motions on November 15, 1995. Plaintiffs moved for reconsideration, and on December 15, 1995, their motion was denied. Plaintiffs appeal.
On July 1, 1991, plaintiff, Mrs. Melissa Canesi, then 11 days overdue for her menstrual period, visited defendant, Dr. Wilson, a specialist in obstetrics and gynecology to have a pregnancy test. A few days earlier, she had taken a home pregnancy test which was negative. Dr. Wilson gave her a urinalysis pregnancy test, which also indicated she was not pregnant. The doctor then prescribed Provera which he told her would bring on her period. He gave her a packet of 10 pills and told her to take one a day for ten days, but to stop taking it if she felt like she was getting her period. She said he told her not to read the pamphlet *357 that comes with the packet because it would scare her. Dr. Wilson conceded that he may have said that.
Mrs. Canesi began taking the Provera on July 2, 1991 and continued for eight days. She started feeling "crampy," but did not begin her period, so she finished the packet. Because she was spotting but had not gotten her period, Mrs. Canesi was sent by Dr. Wilson for a blood serum pregnancy test. On July 18, 1991, he told her the test was positive. After she learned she was pregnant, Mrs. Canesi expressed concern to Dr. Wilson that she had taken pills while she was pregnant. He allegedly told her there was nothing to worry about.
Dr. Wilson admitted he never apprised Mrs. Canesi of any risk to the fetus related to Provera either when it was prescribed or after he learned that she was pregnant. He did have a copy of the Physicians Desk Reference (PDR) at the time and was aware of the "bordered box"[2] warning therein. The 1991 PDR "bordered box" warning for Provera contains the following:
THE USE OF PROGESTATIONAL AGENTS DURING THE FIRST FOUR MONTHS OF PREGNANCY IS NOT RECOMMENDED. Progestational agents have been used beginning with the first trimester of pregnancy in an attempt to prevent habitual abortion or treat threatened abortion. There is no adequate evidence that such use is effective and there is evidence of potential harm to the fetus when such drugs are given during the first four months of pregnancy. Furthermore, in the vast majority of women, the cause of abortion is a defective ovum, which progestational agents could not be expected to influence. In addition, the use of progestational agents with their uterine-relaxant properties, in patients with fertilized defective ova may cause a delay in spontaneous abortion. Therefore, the use of such drugs during the first four months of pregnancy is not recommended. Several reports suggest an association between intra-uterine exposure to female sex hormones and congenital anomalies, including congenital heart defects and limb reduction defects. One study estimated a 4.7-fold increased risk of limb reduction defects in infants exposed in utero to sex hormones (oral contraceptives, hormone withdrawal tests for pregnancy, or attempted treatment for threatened abortion). Some of these exposures were very short and involved only a few days of treatment. The data suggest that the risk of limb reduction defects in exposed fetuses is somewhat less than 1 in 1,000. If the patient is exposed to PROVERA Tablets (medroxyprogesterone acetate) during the first four months of pregnancy *358 or if she becomes pregnant while taking this drug, she should be apprised of the potential risks to the fetus.
[Emphasis added.]
In 1993 the PDR "bordered box" warning was revised as follows:
THE USE OF PROVERA (MEDROXYPROGESTERONE ACETATE) DURING THE FIRST FOUR MONTHS OF PREGNANCY IS NOT RECOMMENDED. Progestational agents have been used beginning with the first trimester of pregnancy in an attempt to prevent habitual abortion. There is no adequate evidence that such use is effective when such drugs are given during the first four months of pregnancy. Furthermore, in the vast majority of women, the cause of abortion is a defective ovum, which progestational agents could not be expected to influence. In addition, the use of progestational agents with their uterine-relaxant properties, in patients with fertilized defective ova may cause a delay in spontaneous abortion. Therefore, the use of such drugs during the first four months of pregnancy is not recommended.
Several reports suggest an association between intrauterine exposure to progestational drugs in the first trimester of pregnancy and genital abnormalities in male and female fetuses. The risk of hypospadias, 5 to 8 per 1,000 male births in the general population, may be approximately doubled with exposure to these drugs. There are insufficient data to quantify the risk to exposed female fetuses, but insofar as some of these drugs induce mild virilization of the external genitalia of the female fetus, and because of the increased association of hypospadias in the male fetus, it is prudent to avoid the use of these drugs during the first trimester of pregnancy. If the patient is exposed to PROVERA Tablets (medroxyprogesterone acetate) during the first four months of pregnancy or if she becomes pregnant while taking this drug, she should be apprised of the potential risks to the fetus.
This revised warning makes no mention of a risk of limb reduction defects, nor has any subsequent edition of the PDR.
Soon after Mrs. Canesi found out that she was pregnant, she began seeing Dr. Loewe for obstetrical care. She said that at her initial visit with Dr. Loewe on July 25, 1991, he said he could not understand why Provera or any synthetic hormone would be prescribed for her, but that it was nothing to worry about. Dr. Loewe stated at his deposition that in his practice he used the PDR "to check on a medicine" and knew about Provera, but was not sure if he knew about the "bordered box" warning. He did not recall whether he warned Mrs. Canesi about taking Provera but stated that it was not his practice to list every possible defect that there could be with the fetus for the possible drugs that a patient may have taken. On March 18, 1992, Mrs. Canesi delivered *359 Brandon, who was normal except for "limb reduction" involving his hands and fingers.
Plaintiffs utilized two experts to support their case. The first, Dr. William Vilensky, D.O., noted that he was not rendering an opinion regarding a causal relationship between Provera and birth defects. He only rendered an opinion on the standard of care required of the doctors under the circumstances, and concluded there was negligence due to failure to inform the patient of the PDR warnings. Plaintiffs' second expert, Dr. Deborah Consoli, M.D., testified that in 1991 the opinions of the medical community were divided as to whether limb reduction could be a consequence of taking Provera during pregnancy. Therefore, not only was there a warning of possible limb reduction in the PDR, but in her view it was also necessary for a physician to inform a patient of the possible risk to the fetus related to use of Provera. She also testified that subsequent to 1991, further medical studies showed that the concern that Provera could cause limb reduction abnormalities was unfounded.
It must be concluded on the record presented to the motion judge and this court that currently the general consensus of medical opinion is that there is no valid evidence of a cause and effect relationship between Provera and limb reduction abnormalities. Beginning with the 1993 PDR, the warning regarding Provera causing limb reduction abnormalities in unborn fetuses was eliminated and has not returned. As no evidence of a cause and effect relationship exists in the record, plaintiffs' direct claims that Brandon's deformity was caused by the prescribing of Provera were properly dismissed.
Plaintiffs argue, however, that the issue of whether Provera caused the child's limb deformities was only one of the three bases for their contention that the defendants are liable. The second basis is that the defendants were negligent in their failures to inform and warn Mrs. Canesi that the drug manufacturer and PDR had issued clear warnings that Provera should not be taken during early pregnancy because Provera was believed to have the *360 potential to cause defects in fetuses, including limb reduction deformities. Plaintiffs argue that this failure to advise Mrs. Canesi deprived her of the opportunity to elect to terminate her pregnancy. The third basis upon which it is argued that Dr. Wilson may be held liable, even if Provera does not cause limb deformities, is that prescribing it when Mrs. Canesi was pregnant increased the risk that if she was carrying an abnormal ova she would retain it, rather than spontaneously abort the ova.
As to the argument that prescribing Provera to a pregnant woman increased the risk that if she was carrying a defective ova it would be retained rather than spontaneously aborted, the judge stated:
There is no testimony to that in the case. The Court views that as a type of complex medical issue where expert testimony is required and any statements to that effect in the PDR would be inadequate to go to the jury.
We concur in that ruling. Assuming that the PDR is admissible as a "learned treatise" (N.J.R.E. 803(c)(18)), its use as substantive evidence is limited to "`situations in which an expert is on the stand and available to explain and assist in the application of the treatise if desired.'" Jacober v. St. Peter's Medical Ctr., 128 N.J. 475, 491, 608 A.2d 304 (1992) (quotation omitted). Accordingly, a party cannot generally introduce a treatise into evidence as a substitute for expert testimony. Biunno, Current N.J. Rules of Evidence, comment on N.J.R.E. 803(c)(18); Adamski v. Moss, 271 N.J. Super. 513, 519-22, 638 A.2d 1360 (App.Div. 1994). See Morlino v. Medical Ctr., 295 N.J. Super. 113, 684 A.2d 944 (App.Div. 1996). Moreover, there is no evidence here of a defective ova that might, but for the use of Provera, have been spontaneously aborted.
We next turn to plaintiffs' argument that the failure to inform and warn Mrs. Canesi deprived her of the opportunity to make a reasoned determination as to whether the pregnancy should be terminated. The motion judge stated:
I view that as an argument that would extend the parameters of current and existing law or would fly in the face of current existing law. The cases that I've read cited by both parties with respect to failure to warn all, without exception, *361 involve failure to warn of risks which ultimately involve the patient suffering from one of the very risks that she was not warned about. There hasn't been one case in the reported decisions that has deviated from that concept. This would be that case
* * * * * * * *
Under the present set of the proofs, in this particular case, from the plaintiffs' experts, it is  it can fairly be concluded that none of the experts can draw a relationship between the ingestion of Provera and the limb deficits that the child was born with.
The question then becomes should liability be imposed because of the failure to warn and essentially whether it's founded or not founded but because it appears in the PDR or similar type of medical reference. And I can't say that there's an obligation and a duty by a doctor to do that. That's not, in my opinion, the status where there has been no causal relationship between the taking of the medication and the defect complained of. I don't think that's the status of our law. It certainly doesn't appear in any of the reported decisions. It certainly doesn't appear in the concepts of probable cause that we've read about
* * * * * * * *
I view [causation] as the lack of a very essential element for a cause of action to accrue, and, therefore, contrary to existing law.
Defendants conceded that for the purposes of the summary judgment motion they had an obligation to warn Mrs. Canesi of the dangers of taking Provera while pregnant and that a breach of the duty of reasonable medical care can be found on the record presented to the motion judge, although at trial they might defend against that assertion. Thus, the present issue turns not on duty, but on proximate cause.
While we agree with plaintiffs' assertion that breach of a standard of care must be measured by the standard in effect at the time it was allegedly breached, we hold that in these circumstances causation is to be determined by up to date medical and scientific evidence. Thus, current knowledge is highly relevant to the issue of whether defendants' acts or omissions "caused" the plaintiff harm. Causation in these circumstances is not timerelated, it must be viewed for our purposes as an absolute truth, subject to discovery by proper investigation.
Plaintiffs, however, assert that even if taking Provera did not cause Brandon to be born with a limb reduction abnormality, both *362 defendants were negligent in not discussing with Mrs. Canesi any of the PDR warnings because, if she had been made aware of any potential for fetal abnormality, she would have aborted the fetus. This deprived her of the choice or chance to abort the pregnancy. Plaintiffs reason that this is what "caused" Brandon to be born with a limb reduction abnormality. Simply stated, it is plaintiffs' position that there is no legal requirement that they prove that Provera directly caused Brandon's limb reduction defect in the circumstances of this case.
Defendants counter by arguing that even as to the "lost opportunity to abort" claim, plaintiffs must establish that the taking of Provera caused Brandon's limb reduction abnormalities. We agree, as we are convinced that plaintiffs' cause of action cannot exist unless it is demonstrated that the undisclosed harm or risk actually occurred and that defendant's negligence was a proximate cause of the condition complained of.
We do not believe that legal acceptance of plaintiffs' theory of causation is appropriate or desirable. Plaintiffs' theory would impose liability for a failure to warn or to obtain informed consent without regard to whether the ultimate consequence in fact related to the condition of which the doctor failed to warn or inform the patient. Moreover, it is clear in this case that if the fetus had been aborted because of the concerns expressed in the PDR, it would have been based on a medical premise now found to be fallacious.
Proximate cause is a concept our law has developed to limit recovery in certain circumstances notwithstanding that a cause in fact may exist between the breach of duty and the damages suffered. The determination of proximate cause is to be based upon a mixed consideration of logic, common sense, justice, policy and precedent. Caputzal v. Lindsay Co., 48 N.J. 69, 77-78, 222 A.2d 513 (1966). Non-liability, in circumstances such as are presented here, involves a question of policy and is a matter of law for the court and not the factfinder. Id. at 75, 222 A.2d 513. Because Brandon's deformity is not related to the drug to which *363 the warning pertained, we hold, as a matter of law, that legal or proximate causation between the consequences of the birth and the failure to warn, resulting in a lost opportunity to abort, may not be found. To hold otherwise would lead to a multitude of tort claims based on "chance occurrences," rather than legally definable causal relationships.
Plaintiffs cite Berman v. Allan, 80 N.J. 421, 404 A.2d 8 (1979) and Procanik v. Cillo, 97 N.J. 339, 478 A.2d 755 (1984), for the proposition that failure to inform, resulting in a lost opportunity to abort claim, does not require a causative link between Provera and the limb reduction abnormality. In Berman, the pregnant plaintiff was at risk due to her age, but she was not told of the availability of an amniocentesis test. The test may have detected chromosomal defects in the fetus indicative of Down's Syndrome. Her baby was born with Down's Syndrome. She alleged that if she had been told about the test, and had it come back positive for Down's Syndrome, she would have aborted. Berman, supra, 80 N.J. at 425, 404 A.2d 8. Our Supreme Court held that "wrongful birth" is actionable and remanded for a trial. Id. at 432, 434, 404 A.2d 8. In Procanik, the pregnant plaintiff consulted her doctors about her recently having had measles. The doctors negligently failed to detect that she had contracted German measles, and therefore they did not tell her that the baby might have congenital rubella syndrome. The baby was subsequently born with the condition. Plaintiff alleged she was deprived of the choice of terminating the pregnancy. Procanik, supra, 97 N.J. at 343-44, 478 A.2d 755. The Court allowed the action stating that "[w]rongful birth" applies to the cause of action of parents who claim that the negligent advice or treatment deprived them of the choice of avoiding conception, or as here, of terminating the pregnancy. Id. at 348, 356, 478 A.2d 755.
These cases are not helpful on the issue before us. In Berman the harm could have been detected by the doctor in the exercise of proper medical care; in Procanik, the undetected German measles was in fact the cause of the child's condition. Here, there is no *364 evidence that Provera can cause limb reduction abnormalities and plaintiffs cannot show that the deformity is detectable by a timely testing procedure. If plaintiffs had demonstrated a causative link between Provera and the limb abnormality, the defendants could be held to answer for their breach. Plaintiffs, however, will not be allowed to use defendants' breach to recover for a "chance occurrence" that was not caused by defendant's failure to warn.
Affirmed.
NOTES
[1] The caption and complaint misspell Dr. Loewe's name as "Lowe."
[2] To emphasize the warning, the PDR prints it inside of a box with a black lined border on all four sides.