**Karen PROVENZANO and Thomas Provenzano, individually, Plaintiff,**

v.

**INTEGRATED GENETICS, et al., Defendants.**

No. Civ.A. 97–1460(MLC).

United States District Court, C.D. New Jersey.

Oct. 13, 1998.

Bard L. Shober, Goldsmith, Weiss, & D'arcy, P.C., Northfield, New Jersey, for plaintiff.

Christopher J. Carey, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Newark, New Jersey, for defendant.

## MEMORANDUM OPINION

HUGHES, United States Magistrate Judge.

This matter comes before the Court on motion of Defendants, Integrated Genetics, Genzyme Genetics, Genzyme Corporation, and Sterling Puck, M.D., for summary judgment. Also pending before the Court is Plaintiffs' motion for leave of Court to amend the Complaint by joining Dr. Charles H. Hux and Shore Perinatal Associates as defendants. Both motions are opposed. The Court reviewed the parties' written submissions and conducted oral argument on September 8, 1998 and October 5, 1998. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C.A. § 636 and FED.R.CIV.P. 73, for all purposes, including trial.

### I. BACKGROUND

#### A. Procedural History

On November 1, 1996, Plaintiffs Karen Provenzano and Thomas Provenzano filed a wrongful birth claim against Defendants, Integrated Genetics, Genzyme Genetics, Sterling Puck, M.D., and John Doe Medical Providers, in the Superior Court of New Jersey, Ocean County Vicinage. The Complaint was amended on December 27, 1997, joining Genzyme Corporation as a Defendant. Genzyme Genetics is the successor corporation to Integrated Genetics and a wholly owned subsidiary of Genzyme Corporation. (Defendant's Answer ¶¶ 11–12). Dr. Puck was the Medical Director of Integrated Genetics on or about June 5, 1995. (Defendant's Answer ¶ 5).

The Complaint, as amended, claims that Defendants' negligence led to the wrongful birth of one of Mrs. Provenzano's twin infants, Tiffany Provenzano ("Tiffany"). More specifically, the Complaint alleges that Defendants negligently analyzed and diagnosed amniocentesis samples collected from Mrs. Provenzano during her pregnancy. The Complaint further alleges that Defendants' negligence deprived Plaintiffs of the necessary information to make an informed decision as to whether to opt for a selective reduction—a procedure in which one fetus of several may be terminated. Plaintiffs seek damages for emotional distress and extraordinary medical expenses attributable to Tiffany's birth defects, consistent with Procanik by Procanik v. Cillo, 97 N.J. 339, 478 A.2d 755 (1984).

On March 24, 1997, this action was removed, on diversity grounds pursuant to 28 U.S.C.A. § 1332, to the United States District Court, District of New Jersey. Defendants filed an Answer to the Complaint on May 2, 1997.

On May 26, 1998, Plaintiffs filed a motion for leave to file an amended complaint seeking to join Dr. Charles Hux and Shore Perinatal Associates as defendants. Dr. Hux, a physician with Shore, was Mrs. Provenzano's primary physician regarding the instant pregnancy. The proposed amended complaint alleges that Dr. Hux "was negligent and/or deviated from the applicable standard of care in conducting and reading the ultra sound studies that [Mrs. Provenzano] underwent." (Amended Complaint ¶ 6.). Dr. Hux performed ultra sound examinations on Mrs. Provenzano every three to four weeks from June 5, 1995 through the birth of the twins in October. (Plaintiff's Statement of Material Facts at ¶¶ 4–8). The proposed amended complaint further alleges that Shore Perinatal Associates "was negligent and/or deviated from the applicable standard of care in setting up standards and guidelines for the performance and interpretation of ultra sound studies" and should be liable for Dr. Hux's conduct under the doctrine of respondeat superior. Id. The proposed amended complaint further alleges that as a result of Dr. Hux's and Shore Perinatal Associates' negligence, Plaintiffs did not have the choice of terminating the pregnancy of one of the fetuses. Plaintiffs contend that Dr. Hux and Shore Perinatal Associates should be joined as defendants at this late juncture because discrepancies between his medical records and his May 14, 1998 deposition testimony revealed the basis for a cause of action against him. Plaintiffs further argue that they moved to amend the Complaint prior to the June 12, 1998 Court ordered deadline for joining additional parties to this litigation.

On June 1, 1998, Defendants filed opposition to Plaintiffs' May 26, 1998 motion to

amend the Complaint. Because the treatment that Dr. Hux provided to Mrs. Provenzano terminated on or around October 14, 1995, upon the birth of her twins, Defendants argue that the applicable statute of limitations had expired prior to May of 1998. Defendants also argue that allowing the amendment would unfairly prejudice them by causing undue delay and by defeating diversity jurisdiction.

Defendants filed the present motion for summary judgment on September 1, 1998. Defendants argue that summary judgment is appropriate because Mrs. Provenzano is unable to testify that, but for any alleged negligence, she would have had an abortion. Plaintiffs oppose Defendants' motion alleging that genuine issues of material fact exist concerning the proximate cause element of Plaintiffs' wrongful birth claim. The Court determined that the motions be heard together to promote efficient case management.

### B. *Factual Background*

Mrs. Provenzano learned that she was pregnant in March of 1995. (Plaintiffs' Exhibit ("P.Ex.") A.). On April 13, 1995, Mrs. Provenzano was initially treated by Dr. Melvyn Ravitz. (*Id.*). Dr. Ravitz referred her to Dr. Charles Hux at Shore Perinatal Associates in May 1995 because Mrs. Provenzano, a thirty-eight year old, was considered a high risk obstetrical patient due to her age and the fact that she was carrying twins. (P.Ex. B, Deposition of Mrs. Provenzano at 43:24 to 45:1; P.Ex. C, Dr. Hux's letter to Dr. Ravitz of May 22, 1995). More than twenty years earlier, Mrs. Provenzano had an abortion. (*Id.* at 100:2).

Dr. Hux performed approximately seven ultra sound examinations on Mrs. Provenzano during her pregnancy. (P.Ex. C). On June 5, 1995, Dr. Hux performed an ultra sound test which indicated the possibility of an enlarged cerebellum for fetus B, who was later named Tiffany. (*Id.*). Dr. Hux's June 7, 1995 letter to Dr. Ravitz explained that he did not discuss the possibility of the enlarged cerebellum with Plaintiffs because "he was not confident enough in the ultrasound finding at that time." (*Id.*).

Also on June 5, 1995, Dr. Hux conducted an amniocentesis for each of Plaintiff's fetuses and sent amniotic samples to Defendant Integrated Genetics. (*Id.*) An amniocentesis is a procedure involving "the insertion of a long needle into the mother's uterus and the removal therefrom of a sample of amniotic fluid containing living fetal cells." *Berman v. Allan,* 80 N.J. 421, 424, 404 A.2d 8 (1979) *citing W. Fuhtmann & F. Vogel, Genetic Counseling* 91–94 (2d Ed.1976). Then, through "karyotype analysis," a procedure in which the number and structure of the cells' chromosomes are examined, the sex of the fetus as well as the presence of gross chromosomal defects can be detected. *Id.* The test results were negative for genetic defects. (P.Ex. D, Chromosome Analysis of June 15, 1995).

On July 6, 1995, after performing an ultrasound on Mrs. Provenzano, Dr. Hux noted "a 30–40% difference in fetal size" and good interval growth for twins A and B. (P.Ex. C, Dr. Hux's letter to Dr. Ravitz of July 6, 1995). At that time, he advised a close follow up. (*Id.*). Dr. Hux wrote that he "explain[ed] the findings to this couple in some detail; however, [he did] not believe that they understood at the time the potential impact of such a diagnosis." (*Id.*).

On August 17, 1995, Dr. Hux noted a "cyst head" in his records without specifying to which fetus he was referring. (P.Ex. C). On September 14, 1995, Dr., Hux's records refer to a diagnosis of a "Subarachnoid or Dandy–Walker cyst in twin B." (*Id.*). On October 12, 1995, two days before the birth of the twins, Dr. Hux's records indicated the following: "cyst in head twin B and dilated bowel. Growth discrepancy about 800 grams. High morbidity, consider delivery within 1–2 weeks max at level 2 center. Discussed with neonatology and pediatric neurologist." (*Id.*).

Mrs. Provenzano gave birth to twin girls on October 14, 1995. Shortly afterwards, Tiffany was moved to the Children's Hospital of Philadelphia. (P.Ex. E). Due to the seriousness of Tiffany's condition, the slides from the June 5, 1995 amniocentesis were reexamined. The reexamination revealed that a Tri-

somy 14 mosaicism, a genetic disease, in fetus B had been overlooked when the slides were originally examined on or around June 5, 1995. (P.Ex. F., Deposition of Richard L. Nue, at 66). The discharge diagnosis from Children's Hospital of Philadelphia, dated January 10, 1996, confirmed Tiffany's genetic disease. Mr. Nue, the Laboratory Director for Defendant, Genzyme Genetics, testified that such a finding "would be expected to be clinically significant." (*Id.*). Tiffany died on June 5, 1996.

Mrs. Provenzano was deposed on March 12, 1998. The following testimony was elicited:

> Counsel for Defendants: It was your understanding that one of the fetuses was coming along just fine, but the other was having some type of problems?
>
> Mrs. Provenzano: Yes.
>
> Q: Did you ask him [Dr. Hux], Well, is the one who is having problems going to hurt the other fetus?
>
> A: Yes.
>
> Q: Who did you ask that?
>
> A: Hux.
>
> Q: What did he say?
>
> A: It's too soon to tell.
>
> Q: Did you ask him, Well, maybe we should abort one of the fetuses?
>
> A: No, it never came up.
>
> Q: Why did it never come up?
>
> A: Because I was never given an opportunity. No one told me.
>
> Q: No one told you what?
>
> A: That I could terminate one pregnancy.
>
> Q: As you sit here now, do you know whether you could have terminated one pregnancy?
>
> A: No.
>
> Q: As you sit here now do you know whether you would have terminated one pregnancy?
>
> A: No.

(Defendant's Exhibit ("D.Ex.") D, Deposition of Mrs. Provenzano at 76:7 to 77:7). Mrs. Provenzano further testified about the choice of terminating the pregnancy as follows:

> Q. What choice are you referring to?
>
> A. To abort the one that was ill and keep the other one.
>
> Q. And are you saying that's what you would have done?
>
> A. I'm not sure.

(D.Ex. D at 82:24 to 83:4).

Mr. Provenzano was also deposed on March 12, 1998. He testified that during the pregnancy he and his wife had not discussed whether they would have aborted fetus B. (D.Ex. D, Deposition of Mr. Provenzano at 114:18–21). Mr. Provenzano then testified as follows:

> Counsel for Defendants: [W]ould you have agreed to terminate one of the fetuses?
>
> . . . .
>
> A: No, I wouldn't have agreed to terminate one of the fetuses. There's no need to. I mean, I wanted both of them.

(*Id.* at 114:22 to 115:8). On August 4, 1998, however, Mr. Provenzano submitted a certification (P.Ex. G, at ¶ 8) in which he alleged that, if he had been advised during his wife's pregnancy that fetus B was afflicted with a genetic disease, he would have favored a selective reduction, i.e., terminating the pregnancy of one of the fetuses. Mr. Provenzano testified that he would have strongly encouraged his wife to the same end. (*Id.*). Mr. Provenzano further stated that his deposition testimony taken on March 12, 1998 was inaccurate because he had not slept in approximately 21 hours. (*Id.* at ¶ 5).

## II. *DISCUSSION*

### A. *Amended Complaint*

 It has been the accepted and encouraged policy that leave to amend pleadings should be liberally granted, when justice so requires. FED.R.CIV.P. 15(a); *Cruz v. City of Camden,* 898 F.Supp. 1100, 1105 (D.N.J.1995). The determination of a motion to amend falls within the sound discretion of the trial court and is guided by FED.R.CIV.P. 15(a). *See Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The United States Supreme Court articulated this liberal standard in *Foman,* which states, in relevant part:

In the absence of any apparent or declared reason—such as undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the amendment ..., the leave sought should, as the rules require, be freely given.

*Id.* at 182, 83 S.Ct. 227. Therefore, when the movant's request to amend is "a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Id.*

■ In applying *Fed.R.Civ.P.* 15(a), the Third Circuit Court of Appeals regards the possibility of prejudice to the non-moving party as the "touchstone for the denial of the amendment." *Bechtel v. Robinson,* 886 F.2d 644, 652 (3d Cir.1989) *quoting Cornell & Co., Inc. v. Occupational Safety and Health Rev. Comm'n,* 573 F.2d 820, 823 (3d Cir.1978). Absent undue prejudice, "denial must be grounded in bad faith or dilatory motives, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment." *Heyl & Patterson International, Inc. v. F.D. Rich Housing of the Virgin Islands,* 663 F.2d 419, 425 (3d Cir.1981) *citing Cornell & Co., Inc.,* 573 F.2d at 823.

### 1. *Futility of Amendment/Statute of Limitations*

■ Where a defendant raises futility of amendment as a defense, the Court must apply the standard of a motion to dismiss, pursuant to *Fed.R.Civ.P.* 12(b)(6). *Jablonski v. Pan American World Airways, Inc.,* 863 F.2d 289, 293 (3d Cir.1988). By adhering to a Rule 12(b)(6) standard, the court is assured that any new claims, without true merit, will fail. *Massarsky v. General Motors Corp.,* 706 F.2d 111, 125 (3d Cir.1983); *Snyder v. Baumecker,* 708 F.Supp. 1451, 1457 (D.N.J. 1989); *see also Adams v. Gould, Inc.,* 739 F.2d 858, 864 (3d Cir.1984), *cert. denied,* 469 U.S. 1122, 105 S.Ct. 806, 83 L.Ed.2d 799 (1985). In accordance with *Fed.R.Civ.P.* 15(a), it is within the discretion of the trial court to deny leave to amend for futility of amendment. In examining the futility of the proposed amendment, the district court should consider the merits of the proposed amendment prior to deciding whether to grant leave to amend. *Snyder,* 708 F.Supp. at 1457.

When considering a motion to dismiss pursuant to *Fed.R.Civ.P.* 12(b)(6), the Court shall take all allegations as true and consider them in the light most favorable to the plaintiff. *Hurst v. Beck,* 1992 WL 189496, at *3, n. 4 (E.D.Pa.1992) (citations omitted). The complaint will only be dismissed if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Id.* (Citations omitted).

■ Defendants argue that Plaintiffs' motion to amend the Complaint must be denied because it was filed after the two-year statute of limitations expired on October 15, 1997. Indeed, Dr. Hux ceased treating Mrs. Provenzano in October 1995 after the birth of the twins, and Plaintiffs filed the instant motion in May of 1998. Clearly, Plaintiffs motion would not withstand a motion to dismiss if it were barred by the statute of limitations.

■ Plaintiffs, however, argue that the statute of limitations should be tolled under the "discovery rule." *See Lopez v. Swyer,* 62 N.J. 267, 300 A.2d 563 (1973). The discovery rule provides that a cause of action will not accrue until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered, that a basis for an actionable claim exists. *Cruz v. City of Camden,* 898 F.Supp. 1100, 1113 (D.N.J.1995) *citing Fernandi v. Strully,* 35 N.J. 434, 173 A.2d 277 (1961). The Supreme Court of New Jersey further explained the discovery rule as follows:

In essence, the discovery rule applies and the statute of limitations begins to run when the plaintiff is aware of an injury and knew that the injury was caused by a third person. The rule is designed to toll the statute of limitations in a situation where the plaintiff realizes an injury but does not know that the injury can be attributed to another. The rule does not require, as the plaintiff suggests, that the plaintiff realize the injurer's exact identity.

*Cruz*, 898 F.Supp. at 1113 *quoting Savage v. Old Bridge–Sayreville Medical Group*, 134 N.J. 241, 633 A.2d 514 (1993).

As established in *Lopez*, the seminal discovery rule case decided by the Supreme Court of New Jersey, courts recognize two classes of injured claimants whose ignorance of a cause of action should not, without more, bar relief. 62 N.J. at 271, 300 A.2d 563; *see also Cruz*, 898 F.Supp. at 1113 n. 16. First, a claimant may be unaware that she has sustained an injury until after the statute of limitations has run. *Id. See e.g., Diamond v. N.J. Bell Telephone Co.,* 51 N.J. 594, 242 A.2d 622 (1968) (The court held that the limitations period did not start to run until the plaintiff discovered, nine years after the event, that the defendant's installation of a conduit had damaged their sewer line). Second, a claimant may be aware that she has suffered an injury, but the injured party may not know the damages are attributable to the fault or neglect of another. *See e.g., Lopez,* 62 N.J. at 274, 300 A.2d 563.

In *Lopez*, the plaintiff suffered burns from radiation therapy administered by the defendants. 62 N.J. at 271, 300 A.2d 563. After the plaintiff's relationship with the defendants ended, the plaintiff sought medical assistance elsewhere. *Id.* While in a hospital for reconstructive surgery, she overheard a doctor who had been treating her say to several colleagues, "And there you see, gentlemen, what happens when the radiologist puts a patient on the table and goes out and has a cup of coffee." *Id.* The court determined that the statute of limitations began to run when she overheard that statement and thereby discovered that her injuries were caused by the fault of another. *Id.*

In *Cruz,* 898 F.Supp. 1100, the original complaint, filed on August 5, 1993, alleged that the plaintiff was wrongfully arrested and incarcerated. The complaint named various John Doe defendants. *Id.* On April 11, 1995, the plaintiff filed a motion to amend the complaint alleging that two depositions taken in March 1994 implicated two new defendants whose identity was previously unknown to the plaintiff. *Id.* at 1103–04. The plaintiff sought to invoke the discovery rule with respect to the previously unidentified defendants. *Id.* at 1104 n. 3. The Cruz court found that:

> The discovery rule is inapplicable since the plaintiff knew at the time of his arrest that there was a problem with the warrant. Indeed, this is the basis of his cause of action. Moreover, he knew or believed that his 'injury', i.e., his arrest and incarceration was attributable to the fault of others. He simply did not know, at that time, the exact identities of all allegedly responsible parties.

*Id.* at 1113.

In the case at hand, Plaintiffs clearly had knowledge of the alleged injury before the statute of limitations ran. Plaintiffs discovered that Integrated Genetics had failed to analyze Tiffany's amniocentesis samples accurately between October 14, 1995 when the twins were born and January 10, 1996 when Tiffany was discharged from the Children's Hospital of Philadelphia. Moreover, Plaintiffs originally filed this cause of action on November 1, 1996, less than thirteen months after Tiffany's birth. Therefore, it is clear that Plaintiffs knew or by an exercise of reasonable diligence and intelligence should have discovered, no later than January 10, 1996, that the deprivation of their choice as to whether they would have terminated fetus B was the result of some negligent conduct.

As the *Cruz* court noted "many of the discovery rule cases use the phrase 'fault of another' and 'identity of another' interchangeably." 898 F.Supp. at 1113. The court specifically declined to apply the discovery rule "simply because a plaintiff knew that his injury was caused by the fault of another, but did not know their exact identity." *Id.* As noted above, Plaintiffs in the present case were aware of the fault of another when they discovered that Integrated Genetics had failed to analyze the amniocentesis samples accurately. In addition, Plaintiffs obviously knew the identity of Dr. Hux and Shore Perinatal Associates as early as May of 1995. Moreover, Plaintiffs knew first hand what Dr. Hux advised them and could have had access to his records. Like *Cruz,* the instant case is clearly distinguishable from *Lopez* because Plaintiffs were aware of the fault and even the exact identity of an-

other long before the applicable statute of limitations expired.

Plaintiffs nonetheless contend that they did not learn that they had a potential cause of action against Dr. Hux and Shore Perinatal Associates until Dr. Hux deposition was taken on May 12, 1998. Plaintiffs' argument, however, ignores the fact that Plaintiffs had access to Dr. Hux's medical records prior to the expiration of the statute of limitations. Dr. Hux's records contain a June 7, 1995 letter to Dr. Ravitz which specifically indicates that he noted an enlarged cerebellum in fetus B on June 5, 1995, yet he did not notify Plaintiffs of his finding. Plaintiffs had ample opportunity to join Dr. Hux and Shore Perinatal Associates as defendants based on his medical records. Allowing Plaintiffs to join Dr. Hux and Shore Perinatal Associates at this point in the litigation defeats the very purpose of the statute of limitations.

Since the discovery rule is not applicable, New Jersey law dictates that the statute of limitations begins to run at the time when the potential plaintiffs are aware, or should be aware, of the existence of the injury. *Cruz*, 898 F.Supp. at 1115 *citing Viviano v. CBS Inc.*, 101 N.J. 538, 503 A.2d 296 (1986). Mr. and Mrs. Provenzano were aware of the instant cause of action no later than January 10, 1996 when Tiffany was discharged from the Children's Hospital of Philadelphia. The statute of limitations, therefore, expired no later than January 11, 1998. Therefore, Plaintiffs' motion to amend the Complaint to join Dr. Hux and Shore Perinatal Associates is denied as futile.

### B. *Summary Judgment*

Summary judgment may be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *FED.R.CIV.P.* 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In a summary judgment motion, the non-moving party receives the benefit of all reasonable doubts and any inferences drawn from the underlying facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the non-moving party bears the burden of proof

at trial as to a dispositive issue, Rule 56(e) requires him to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). Issues of material fact are genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### 1. *Cause of Action/Wrongful Birth*

■ New Jersey law provides two separate causes of action, "wrongful life" and "wrongful birth," that may arise when negligent medical treatment deprives parents of the option to terminate the pregnancy of a defective fetus. *Procanik by Procanik v. Cillo*, 97 N.J. 339, 348, 478 A.2d 755 (1984). Here, Plaintiffs have filed a wrongful birth claim.

■ Wrongful life claims were first recognized by the New Jersey Supreme Court in *Procanik*, 97 N.J. at 347, 478 A.2d 755. The term " 'wrongful life' refers to a cause of action brought by or on behalf of a defective child who claims that but for the defendant doctor's negligent advice to or treatment of its parents, the child would not have been born." *Procanik*, 97 N.J. at 348, 478 A.2d 755. *See also Rossi v. Somerset Ob–Gyn Associates*, 879 F.Supp. 411, 414 (D.N.J. 1994). In *Procanik*, 97 N.J. at 342, 478 A.2d 755, the infant plaintiff, Peter Procanik, filed a wrongful life suit alleging that the defendant doctors negligently failed to diagnose that his mother had contracted German measles in the first trimester of her pregnancy. As a result, the plaintiff was born with congenital rubella syndrome. *Id.* The original complaint included a wrongful birth claim filed by the infant plaintiff's parents. *Id.* at 344, 478 A.2d 755. The trial court, however, determined "that the parents' wrongful birth claim was barred by the two-year statute of limitations contained in N.J.S.A. 2A:14–2." *Id.* However, in recognizing the infant plaintiff's wrongful life claim, the court reasoned as follows:

Whatever logic inheres in permitting parents to recover for the cost of extraordinary medical care incurred by a birth-defective child, but in denying the child's own right to recover those expenses, must yield to the inherent injustice of that result.

... The present case proves the point. Here, the parents' claim is barred by the statute of limitations. Does this mean that Peter must forego medical treatment for his blindness, deafness, and retardation? We think not.

*Id.* at 351–52, 478 A.2d 755. Consequently, the court held that "a child or his parents may recover special damages for extraordinary medical expenses incurred during infancy ...." *Id.* at 352, 478 A.2d 755. In recognizing wrongful life claims, the court limited the available damages. *Id.* at 342–43, 478 A.2d 755. The court noted that an infant plaintiff "may not recover general damages for emotional distress or for an impaired childhood." *Id.*

█ On the other hand, a wrongful birth cause of action is brought by parents who claim that "negligent medical advice or treatment deprived them of the choice of avoiding conception or ... of terminating the pregnancy." *Procanik*, 97 N.J. at 348, 478 A.2d 755. The New Jersey Supreme Court first recognized a wrongful birth cause of action in *Berman v. Allan*, 80 N.J. 421, 404 A.2d 8 (1979).

In *Berman*, the parents of Sharon Berman, suing both in their own names and as guardians *ad litem* for their infant daughter, filed a medical malpractice action on claims of wrongful life and wrongful birth. 80 N.J. 421, 404 A.2d 8. The plaintiffs alleged that the defendants negligently failed to inform Mrs. Berman during her pregnancy of the existence of the amniocentesis procedure. *Id.* at 424, 404 A.2d 8. The plaintiffs further alleged that due to Mrs. Berman's age, thirty-eight, the risk that her child would be born with Down's Syndrome was sufficiently great that sound medical practice at the time of pregnancy required the defendants to inform her of that risk and the availability of amniocentesis. *Id.* at 425, 404 A.2d 8. The complaint further asserted that had Mrs.

Berman been so informed, she would have submitted to the amniocentesis procedure, discovered that the fetus was going to suffer from Down's Syndrome, and aborted the fetus. *Id.* In light of the United States Supreme Court's ruling in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147. 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the *Berman* court reasoned that a physician, whose negligence deprived a mother of her right to decide whether her fetus should be aborted, "should be required to make amends for the damage he has proximately caused." 80 N.J. at 432, 404 A.2d 8. Consequently, the *Berman* court permitted the parents to recover damages for emotional distress and anguish caused by the defendants' negligence. 80 N.J. at 433, 404 A.2d 8.

In *Schroeder v. Perkel*, 87 N.J. 53, 432 A.2d 834 (1981), the New Jersey Supreme Court liberalized the recovery available in a "wrongful birth" cause of action by permitting parents to recover the extraordinary medical expenses incurred in raising their child. In *Schroeder*, the parents of Thomas Schroeder ("The Schroeders"), filed a wrongful birth claim against the defendant physicians alleging that the defendants negligently failed to diagnose cystic fibrosis, a hereditary disease, in the plaintiffs' first child. 87 N.J. 53, 432 A.2d 834. The Schroeders did not learn that their first child had cystic fibrosis until it was four years old, though the condition is easily detectible in infants. *Id.* at 59, 432 A.2d 834. By the time they learned of their first child's condition, Mrs. Schroeder was eight months pregnant with Thomas who also suffered from cystic fibrosis. *Id.* at 58, 432 A.2d 834. Thus, the plaintiffs alleged that they were "deprived of an informed choice of whether to assume the risk of a second child." *Id.* The court held that parents "have the right of their own either to accept or reject a parental relationship, and the deprivation of that right by negligent misconduct of another, creates a cause of action in the parents." *Id.* at 66, 432 A.2d 834.

### 2. *Causation/Standard*

Defendants' motion for summary judgment relies heavily on *Rossi v. Somerset Ob–Gyn*

*Associates,* 879 F.Supp. 411 (D.N.J.1994). In *Rossi,* suit was filed by plaintiffs Frank and Eileen Rossi as individuals and by Eileen Rossi as guardian *ad litem* of her infant son, Michael Rossi. 879 F.Supp. at 412. The suit alleged claims of wrongful life and wrongful birth. *Id.* Both claims alleged that the physician defendants negligently failed to determine that Michael Rossi suffered from congenital birth defects during Mrs. Rossi's pregnancy. *Id.* The complaint further alleged that as a result of defendants' negligence, Mr. and Mrs. Rossi did not have the choice of terminating the pregnancy. *Id.* Having found that the parents' *wrongful birth* claim was barred by the applicable statute of limitations, the court granted the defendants' motion for summary judgment on the *wrongful birth* claim. *Id.* (Emphasis added).

Initially, the court denied the defendants' motion for summary judgment on the infant plaintiff's wrongful life claim based on the belief that New Jersey law did not require a showing that his parents would have chosen to have an abortion if they had been aware of his condition. *Id.* However, following jury selection, the court reconsidered its opinion and decided that its original view of New Jersey law on wrongful life was incorrect. *Id.* "Based upon plaintiffs' counsel's representations that neither parent would testify that the infant would have been aborted if the parents had known of his condition, the court concluded that the infant plaintiff could not sustain a prima facie case for *'wrongful life.'* " *Id.* at 412–13 (emphasis added). As a result, the court granted judgment in favor of the defendants under FED.R.CIV.P. 50(a). *Id.* at 413. Thus, the court ultimately followed the precedent established in *Procanik,* 97 N.J. 339, 478 A.2d 755, and concluded that "the New Jersey Supreme Court would require a plaintiff [pursuing a wrongful life claim] to establish that, but for the defendants' negligence, he would not have been born." *Id.* at 414.

However, the present cause of action, filed by Mrs. and Mr. Provenzano, is a "wrongful birth" claim. Notwithstanding distinctions between "wrongful birth" and "wrongful life" claims drawn by the *Procanik* court, Defen-

dants argue that the causes of action are identical requiring the same standard for causation. (Defendants' Brief at 7, *citing Procanik, supra; Rossi, supra* ). Specifically, Defendants argue that a "wrongful birth" claimant must prove that but for the doctor's negligent advice the child would not have been born. (Defendants Reply Brief at 3, *citing Procanik, supra* ). Although at first blush understandable, Defendants' reliance on *Procanik* and *Rossi* is, in this Court's view, misplaced. Both cases were initially filed with distinct counts setting forth wrongful life and wrongful birth claims. *Procanik,* 97 N.J. at 343, 478 A.2d 755; *Rossi,* 879 F.Supp. at 412. In each case, however, the respective trial courts dismissed the counts alleging wrongful birth claims as being barred by the applicable statute of limitations. *Procanik,* 97 N.J. at 344, 478 A.2d 755; *Rossi,* 879 F.Supp. at 412. Thus, *Procanik* and *Rossi* are not controlling authorities as they relate to wrongful birth claims.

■■ Defendants argue that summary judgment should be granted because Mrs. Provenzano's deposition testimony did not conclusively establish that she would have terminated fetus B *but for* Defendants' failure to inform her and her husband of the accurate test results. In *Rossi,* the plaintiff's mother similarly did not testify that she would have undergone an abortion had she known of the child's birth defects. 879 F.Supp. at 415. Mrs. Rossi provided the following testimony:

Q. This lawsuit is about a claim that the doctors failed to detect these abnormalities when Michael was in your uterus. Is it your contention that had you known of these abnormalities that you would have aborted Michael?

A. It's my contention that I was never given the choice.

*Id.* While wrongful life claims require a *but for* proximate cause test, the Supreme Court of New Jersey has never established such a high standard for a wrongful birth claim, as Defendants allege, nor can this Court predict that it would do so.

■■ Wrongful birth is a distinct cause of action from that of informed consent, but both doctrines share notable similarities. In-

formed consent is "a negligence concept, predicated on the duty of a physician to disclose to a patient such information as will enable the patient to make an evaluation of the nature of the treatment and of any attendant substantial risks, as well as of available options in the form of alternative therapies." *Largey v. Rothman, M.D.*, 110 N.J. 204, 540 A.2d 504 (1988). In *Largey*, the Supreme Court of New Jersey, following the lead of the federal courts, established a new standard in New Jersey for informed consent cases. 110 N.J. 204, 540 A.2d 504 *citing Canterbury v. Spence*, 464 F.2d 772 (D.C.Cir.), *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972). The court applied the "prudent patient" standard which focuses on "what a physician should disclose to a reasonable patient in order that the patient might make an informed decision." *Id.* at 206, 540 A.2d 504. Under the prudent patient standard, in informed consent cases, "causation must be shown: i.e., that the prudent person in the patient's position would have decided differently if adequately informed." *Largey*, 110 N.J. at 215, 540 A.2d 504 *quoting Perna v. Pirozzi*, 92 N.J. 446, 460 n. 2, 457 A.2d 431 (1983).

While carefully distinguishing informed consent from wrongful birth, Defendants argue that summary judgment is appropriate because Plaintiffs cannot prove that Defendants' negligence was the proximate cause of Plaintiffs' injury. Thus, Defendants contend that a critical aspect of a wrongful birth claim is whether parents, if adequately informed, would decide to terminate a fetus with a birth defect. In arguing that Plaintiffs did not conclusively establish that they would have aborted fetus B, had they received sufficient information to make an informed decision, Defendants adopt a subjective approach to proximate cause. Such an approach would require the Court to analyze Plaintiffs' testimony, their religious convictions, and other evidence that would tend to prove whether Plaintiffs would have opted for an abortion. For example, if Plaintiffs ardently opposed a woman's right to an abortion for religious reasons, the Court could reasonably conclude, subjectively, that Plaintiffs failed to establish proximate cause because they would not have opted for the abortion, even if Defendants had properly advised them of the choice.

In contrast, Plaintiffs argue for an objective proximate cause standard consistent with the prudent patient standard followed in informed consent cases. That is, whether a reasonably prudent patient would abort a fetus under the same circumstances. Such analysis would ignore the plaintiffs involved in a particular case and have the factfinder predict what the mythical prudent patient would have done under the same circumstances. Plaintiffs' argument is based on an unreported case that was tried in the Superior Court of New Jersey, Middlesex County, Law Division, *Patel v. Shaw*, Docket No. L–12557–93. In *Patel*, an informed consent case, the court instructed the jury that an objective, reasonable person standard would apply to proximate cause. *New Jersey Jury Verdict Review & Analysis*, February 1998, Vol. 18, Issue 9, at 11–12. There was no evidence regarding whether the mother would have undergone an abortion. *Id.* Although Plaintiffs advocate the prudent patient standard as it was used in the *Patel* trial, the Court cannot consider *Patel* an authoritative source of New Jersey law as there exists no opinion, embodying all relevant facts, upon which to rely.

Having found that New Jersey case law does not specifically address proximate causation in a wrongful birth context, this Court must predict how the New Jersey Supreme Court would address this issue. *See Polselli v. Nationwide Mutual Fire Ins. Co.*, 126 F.3d 524, 528 n. 3 (3d Cir.1997). The Court finds that neither Defendants' strict 'but for' analysis nor Plaintiffs' 'prudent patient' approach is suitable to the case at hand.

■ In wrongful birth cases, the issue of proximate causation does not conclusively depend upon whether the plaintiff parents would have aborted a fetus with a birth defect, had they been advised of their option to do so. Rather, proximate cause may be established by evidence demonstrating that the defendant's negligence deprived the plaintiffs of their right to accept or reject a parental relationship. Here, giving Plaintiffs the benefit of all reasonable doubts and infer-

ences drawn from the underlying facts, the Court is satisfied that Plaintiffs have produced sufficient evidence that Defendants failed to provide Plaintiffs accurate amniocentesis samples and thereby deprived Plaintiffs of their right to decide whether to abort fetus B. Should the jury find Defendants liable for Plaintiffs' injury, the issue of whether Plaintiffs would have actually decided to abort fetus B is a question for the jury to assess, along with other facts, when they consider proximate cause and damages.

The Court believes that the New Jersey Supreme Court would most likely adopt the reasoning expressed in a recent New Jersey Appellate Division case. *See Lynch v. Scheininger,* 314 N.J.Super. 318, 714 A.2d 970 (App.Div.1998). Mrs. Lynch was treated by several physicians during a 1984 pregnancy that resulted in a stillbirth. *Lynch,* 314 N.J.Super. 318, 321, 714 A.2d 970. The stillbirth resulted from erythroblastosis fetalis, which is essentially "a condition caused by the incompatibility of maternal and fetal blood Rh factors." Id. at 322, 714 A.2d 970. In 1986, Mr. and Mrs. Lynch brought a malpractice action seeking damages for the stillbirth and injury to Mrs. Lynch's childbearing capacity which led to a settlement. *Id.* During the pendency of the prior action, Mrs. Lynch gave birth to Joseph Lynch on January 11, 1987, who was born with serious neurological impairments. *Id.* Like the 1984 stillbirth, Joseph's condition was caused by erythroblastosis fetalis. *Id.* In January of 1990, Mr. and Mrs. Lynch, and Joseph Lynch, an infant, filed the suit which led to the *Lynch* decision. *Id.* The plaintiffs alleged, *inter alia,* that the defendants failed to diagnose and treat Mrs. Lynch's Rh isoimmunization which caused the 1984 stillbirth and contributed to Joseph's disabilities. *Id.* at 322–23, 714 A.2d 970.

On appeal, the Appellate Division considered "whether Joseph [was] barred from any recovery for Dr. Scheininger's malpractice because his parents' voluntary and intentional act of conceiving him despite their awareness of Mrs. Lynch's sensitized condition constituted a supervening cause of his disabilities." *Id.* at 326, 714 A.2d 970. The court likened a parent's decision to continue a pregnancy to an intervening cause and held that Joseph was not barred from pursuing a malpractice claim against Dr. Scheininger. *Id.* In so holding, the court set forth principles of tort law applicable to the case at hand:

[A] tortfeasor is generally held answerable for injuries which result in the ordinary course of events from his negligence and it is generally sufficient if his negligent conduct was a substantial factor in bringing about the injuries. The fact that there were also intervening causes which were foreseeable or were normal incidents of the risk created would not relieve the tortfeasor of liability. Although the limit of proximate cause is, ultimately, an issue of law that entails a consideration of public policy and fairness, questions of proximate or intervening cause are ordinarily factual determinations for the jury.

*Id.* at 326–27, 714 A.2d 970 (citations and quotations omitted).

Similarly, in a case currently pending before the New Jersey Supreme Court, the Appellate Division noted that the determination of proximate cause is to be based upon "a mixed consideration of logic, common sense, justice, policy and precedent." *Canesi v. Wilson,* 295 N.J.Super. 354, 362, 685 A.2d 49 (App.Div.1996), *cert. granted,* 149 N.J. 139, 693 A.2d 109 (1997). In *Canesi,* the infant, Brandon, and his parents brought a medical malpractice suit against several physicians. The plaintiffs alleged that the defendants were liable for Brandon's birth defects and for failing to advise Mrs. Canesi of potential hazards related to the use of a progestational agent, Provera. *Id.* at 360, 685 A.2d 49. The plaintiffs further alleged that the defendants' negligence deprived her of the opportunity to elect to terminate the pregnancy. *Id.* Having found no valid evidence of a cause and effect relationship between the use of Provera and Brandon's abnormalities, the court held that the plaintiffs had not established proximate causation. *Id.* at 363, 685 A.2d 49. The court further held that, absent a showing of proximate causation, the defendants were not liable for failing to inform and warn Mrs. Canesi. *Id.* Nor were

they liable for her lost opportunity to abort. *Id.*

*Canesi* is distinguishable from the present case as the issue of proximate causation here does not concern whether Defendants' negligence caused Tiffany's Trisomy 14 mosaicism. The cause of Tiffany's genetic condition is not at issue. The alleged injury is Tiffany's very birth, or otherwise put, the deprivation of the Provenzano's opportunity to abort fetus B. Whether Defendants' alleged negligence caused Plaintiffs' injury is an issue best left for the jury.

Defendants' essential argument that Mrs. Provenzano's testimony fails to establish proximate cause is, in the final analysis, unpersuasive. As noted above, in a *wrongful birth* claim, Plaintiffs' indecisiveness in saying definitively that they would have decided to abort a defective fetus should not be fatal to their claim. *See Schroeder, supra.* The very basis for the parents' cause of action, inaccurate information resulting from Defendants' negligence, is underscored by Plaintiffs' later indecision and anguish and forms the necessary link between the negligent act and the resulting injury. This indecision and confusion, along with other circumstances in the case, like a prior abortion and Mr. Provenzano's advice and desire to continue or abort the pregnancy, are all genuine issues of fact to be determined by a jury. For example, here, Mr. Provenzano has given conflicting statements under oath. Mr. Provenzano initially testified that, had he been informed of fetus B's birth defects, he would have wanted his wife to proceed with the pregnancy anyway. Later, he submitted a certification changing his position. It is uniquely for a jury, and not a court, to decide these issues.

Finally, Defendants argue that Defendant, Integrated Genetics, did not breach any duty under the informed consent doctrine. Defendants argue that Integrated Genetics only had a duty to advise Mrs. Provenzano's physician of its findings. The duty to advise a physician, and not a patient directly is called the "learned intermediary" doctrine. Under the learned intermediary doctrine, "a pharmaceutical manufacturer generally discharges its duty to warn the ultimate user of prescription drugs by supplying physicians with information about the drug's dangerous propensities." *Niemiera v. Schneider,* 114 N.J. 550, 559, 555 A.2d 1112 (1989).

The learned intermediary doctrine bears a superficial application to the instant case. A positive amniocentesis (the accurate result here) would be sufficient to alert the parent to a problem with only minimal interpretation by the doctor. As noted above, the Supreme Court of New Jersey held that parents "have the right of their own either to accept or reject a parental relationship, and the deprivation of that right by negligent misconduct of another, creates a cause of action in the parents." *Schroeder,* 87 N.J. at 66, 432 A.2d 834. Therefore, the Court finds that the duty to provide accurate information that may lead to the decision to terminate a pregnancy, may be extended to a laboratory providing amniocentesis samples to a physician.

If the Defendants did indeed provide inaccurate information, it seems clear to this Court that Integrated Genetics breached its duty to Mrs. Provenzano, which deprived her of the opportunity to reject, or accept, a parental relationship with Tiffany. Granted, Dr. Hux would ultimately present the results of the amniocentesis to Mrs. Provenzano, but that presentation would essentially involve an indication of positive or negative results. Clearly, the present situation is distinguishable from "learned intermediary" cases where a pharmaceutical company distributes a product to a physician who may then choose to prescribe the product to a particular patient.

No one can doubt that the decision to terminate a pregnancy is the single most personal and important moral decision that a woman can make during her lifetime. Thus, some may say that the 'but for' test is appropriate; that is, if the mother cannot even make this decision, how can someone else possibly make it? But, the Court believes that this standard is too harsh.

Similarly, the prudent person standard is not appropriate in a case involving such a uniquely personal and moral decision. In

the final analysis, a jury should consider all of the facts and circumstances (e.g., the mother's later failure to say she would have aborted, her religious views, her husband's testimony, a prior abortion) to determine proximate cause.

Further, it is for a jury to determine damages. It may well be that Mrs. Provenzano's inability to testify that she would have had an abortion would operate as a limitation on damages (i.e., compensation for her emotional distress and suffering but not medical expenses for the child). However, the parties have not had a fair opportunity to present this issue to the Court. Resolution of the damages issue, though, is not necessary to decide this summary judgment motion. It is uniquely for a jury, and not a court, to decide these issues.

The primary factual issue to be decided is whether Defendants' alleged negligence was a substantial factor in bringing about Plaintiffs' injury, the wrongful birth of Tiffany. The additional fact that there may have been an intervening cause of Tiffany's birth (i.e., the failure of the parents to unequivocally say that she would be aborted) does not require dismissal as a matter of law. Even if the parents would have exercised their moral prerogative to continue with the pregnancy of fetus B, they were entitled to accurate amniocentesis results. Therefore, summary judgment is inappropriate and the motion will be denied.

### III. CONCLUSION

For the reasons stated herein, Plaintiffs' motion for leave to amend the Complaint is denied, and Defendants' motion for summary judgment is denied.