730 A.2d 805

BRANDON CANESI, A MINOR BY HIS PARENTS MELISSA AND SEBASTIAN CANESI AS GUARDIAN AD LITEM, MELISSA AND SEBASTIAN CANESI, INDIVIDUALLY, PLAINTIFFS–APPELLANTS, v. JAMES A. WILSON, M.D. AND RONALD LOEWE, M.D., DEFENDANTS–RESPONDENTS, AND JOHN DOE PHYSICIAN (2–10) AND JOHN DOE DRUG MANUFACTURER (1–10), DEFENDANTS.

Argued November 3, 1997—Decided June 17, 1999.

494

496

*Jay L. Hundertmark,* argued the cause for appellants (*Valore Law Offices,* attorneys).

*Robert E. Paarz,* argued the cause for respondent James A. Wilson, M.D. (*Paarz, Master, Koernig, Crammer, O'Brien & Bishop,* attorneys; *Mary Ann C. O'Brien,* on the letter in lieu of brief).

*Donald J. Grasso,* argued the cause for respondent Ronald Loewe, M.D. (*Orlovsky, Grasso & Bolger,* attorneys; *Nina M.C. Halpin,* on the letter in lieu of brief).

The opinion of the Court was delivered by

HANDLER, J.

In this medical malpractice case, parents brought suit against two obstetricians after their child was born with the congenital defect of bilateral limb reduction. The parents' principal allegation was that the doctors were negligent in failing to warn them that a drug prescribed for the plaintiff mother posed the specific risk of fetal limb reduction and that the prescribed drug caused this defect. They also alleged other acts of negligence, including the failure to warn of general, unspecified fetal risks posed by the prescribed drug, and to take diagnostic measures during the mother's pregnancy that would have disclosed the presence of a fetal defect. They assert that as a result of defendants' negligence they were deprived of their right as parents to decide whether or not to terminate the pregnancy, they would have terminated the pregnancy had they been warned, and they are entitled to the damages allowable in a wrongful birth cause of action. The doctors, focusing on the parents' allegation that the prescribed drug caused their child's birth defect, characterize plaintiffs' claims as based on the doctrine of informed consent and

contend, accordingly, that they cannot be found liable because the parents cannot prove medical causation, that is, that the drug was the medical cause of the child's congenital impairment.

In light of the contentions of the parties and the determinations of the lower courts, the basic issue that must be addressed is whether it is necessary to establish medical causation in a wrongful birth action that involves the prescription of drugs without adequate warning of the fetal risks posed by those drugs.

I

On July 1, 1991, plaintiff Melissa Canesi, then twenty-nine years old, consulted defendant Dr. James A. Wilson, a specialist in obstetrics and gynecology, concerned that she might be pregnant because she had been amenorrheic for eleven days. A urinalysis yielded the same results as a home pregnancy test had: plaintiff was not pregnant. Thereafter, Dr. Wilson prescribed for plaintiff Provera, a progestational agent designed to induce menstruation. Dr. Wilson did not provide any information to plaintiff concerning the potential side effects and contraindications of the drug. At the time, the *Physicians' Desk Reference* (PDR) warned that if a woman was or became pregnant while taking Provera, she should be advised that there was a risk that the fetus would suffer from congenital anomalies, including limb reduction, and a risk that she would retain a defective ovum instead of spontaneously aborting it.

Provera did not succeed in inducing menstruation and, on July 15, Dr. Wilson gave plaintiff a blood serum test to determine if she was pregnant. This time, the test was positive. Upon learning that she was pregnant with twins, plaintiff asked Dr. Wilson if her ingestion of Provera would have a deleterious impact on the fetuses or the course of her pregnancy. Dr. Wilson told plaintiff not to worry.

Because Dr. Wilson was not a participating physician in plaintiff's health insurance plan, she needed to look elsewhere for pregnancy care. On July 25, she saw Dr. Ronald Loewe for the first time and informed him both of her pregnancy and of the fact

that she had taken Provera. Dr. Loewe told her that she should not be concerned that she had taken the drug.

Plaintiff's pregnancy was not without incident. She began spotting, one of the fetal twins died, and an amniocentesis revealed excessive amniotic fluid, an indication that the remaining fetus might be suffering from an abnormality. On March 18, 1992, plaintiff gave birth to a boy, Brandon, who had the congenital impairment of bilateral limb reduction.

Plaintiff, together with her husband Sebastian, sued Drs. Wilson and Loewe, alleging that Dr. Wilson was negligent for failing to diagnose her pregnancy in a timely manner, and that both doctors were negligent for failing to inform her of the effect her ingestion of Provera would have on her fetus and for "otherwise" negligently caring for and treating her. Plaintiff claimed that had she known of the risk of congenital defects generally, or limb reduction specifically, that Provera posed to her remaining fetus, or had she been told that she was at an increased risk of retaining a defective ovum, she would have terminated her pregnancy. Being kept ignorant of these risks, she asserted, deprived her of the personal choice of determining whether or not to terminate her pregnancy. The complaint also included a claim brought on behalf of Brandon. That claim alleged that Provera caused his bilateral limb reduction and that defendants were negligent in prescribing the drug to his mother without warning of this risk.

Defendants moved for summary judgment. They pointed out that not only did plaintiffs fail to present any expert testimony that Provera caused fetal limb reduction, but the latest edition of the PDR no longer contained a warning that Provera was even associated with this defect.[1] Construing the cause of action essentially to be one involving the lack of informed consent, the defendants contended that, because plaintiffs could not prove medical causation, *i.e.*, that Provera had actually caused Brandon's

---

[1] For purposes of the motion, the doctors conceded that they were negligent in failing to warn plaintiffs of any risks associated with Provera.

limb reduction, defendants, as a matter of law, could not be found liable.

The trial court granted defendants' motion, noting that a plaintiff who alleges that her physician's malpractice consists of a failure to disclose material risks of a prescribed drug must prove that the drug in fact caused the harm that materialized. The Appellate Division affirmed. 295 *N.J.Super.* 354, 685 *A.*2d 49 (1996). The court determined that even if plaintiffs' claim was denominated a wrongful birth action based on the lost opportunity to terminate the pregnancy, plaintiffs still "must establish that the taking of Provera caused Brandon's limb reduction abnormalities." *Id.* at 362, 685 *A.*2d 49.

The Court granted plaintiffs' petition for certification. 149 *N.J.* 139, 693 *A.*2d 109 (1997).

## II

### A.

A wrongful birth cause of action is predicated on a woman's right to determine for herself whether or not to continue or terminate her pregnancy. Persons "have a right of their own either to accept or reject a parental relationship, and the deprivation of that right by the negligent misconduct of another creates a cause of action in the parents." *Schroeder v. Perkel,* 87 *N.J.* 53, 66, 432 *A.*2d 834 (1981). The right protects a distinctively personal interest. *See Hummel v. Reiss,* 129 *N.J.* 118, 136, 608 *A.*2d 1341 (1992) (Handler, J., dissenting) (noting that because decision to terminate pregnancy "involve[s] profound moral and personal issues," it is one that "only [the patient] could make").

The violation of the interest in self-determination that undergirds a wrongful birth cause of action consists of the parents' lost opportunity to make the personal decision of whether or not to give birth to a child who might have birth defects. *Schroeder, supra,* 87 *N.J.* at 66, 432 *A.*2d 834. The claim in a wrongful birth action can arise when a physician fails to provide adequate genetic counselling, *see id.* at 63, 432 *A.*2d 834, fails to detect a discover-

able fetal defect or to inform the parents thereof, *see Berman v. Allan,* 80 *N.J.* 421, 404 *A.*2d 8 (1979), fails to interpret test results properly, *see Procanik v. Cillo,* 97 *N.J.* 339, 478 *A.*2d 755 (1984), or fails to warn of a child being born with a defect, *see Harbeson v. Parke–Davis, Inc.,* 98 *Wash.*2d 460, 656 *P.*2d 483, 491 (1983); *see also Williams v. University of Chicago Hosp.,* 179 *Ill.*2d 80, 227 *Ill.Dec.* 793, 688 *N.E.*2d 130, 133 (1997) (stating that in wrongful birth actions, parents allege that they would not have carried fetus "to term if it had not been for the defendant's negligence in prenatal testing, genetic prognosticating, or counseling [them] as to the likelihood of giving birth to a physically or mentally impaired child" (internal quotation and citation omitted)).

■ Because the patient's protectable interest is the personal right of self-determination, the doctor's duty of disclosure must be sufficient to enable her to make an informed and meaningful decision concerning whether or not to continue the pregnancy.

■ Compensable damages in a wrongful birth case include the emotional injury of the parents caused by the deprivation of "the option to accept or reject a parental relationship with the child...." *Berman, supra,* 80 *N.J.* at 433, 404 *A.*2d 8. These damages also include the special medical expenses attributable to raising a child with a congenital impairment. *See Schroeder, supra,* 87 *N.J.* at 70, 432 *A.*2d 834. Damages, however, do not encompass the birth defect or congenital impairment itself. *See Berman, supra,* 80 *N.J.* at 429–30, 404 *A.*2d 8 (stating that plaintiff may not recover compensable damages for existence *per se* of child in impaired state).

■ Because in a wrongful birth action damages for the birth defect itself are not recoverable, the parents are not required to prove that the doctor's negligence caused the defect. *See Keel v. Banach,* 624 *So.*2d 1022, 1029 (Ala.1993) ("The nature of the tort of wrongful birth has nothing to do with whether a defendant caused the injury or harm to the child, but, rather, with whether the defendant's negligence was the proximate cause of the parents' being deprived of the option of ... making an informed and

meaningful decision either to terminate the pregnancy or to give birth to a potentially defective child."); *Robak v. United States,* 658 *F.*2d 471, 477 (7th Cir.1981) (stating that causation in wrongful birth action "is not based on the injuries to the fetus but on defendant's failure to diagnose [plaintiff's medical condition] and inform her of the consequences [to her pregnancy]"); *see also Provenzano v. Integrated Genetics,* 22 *F.Supp.*2d 406, 417 (D.N.J. 1998) (acknowledging in wrongful birth case, medical causation not required because "cause of [the child's] genetic condition is not at issue"; rather "[t]he alleged injury is [the child's] very *birth*"); discussion *infra* at 514–18, 730 *A.*2d at 817–20. Because the cognizable harm is the emotional and economic injury suffered by the parents, they must prove that these injuries were proximately caused by the doctor's negligence in depriving them of the opportunity to decide whether or not to become parents of a child with a congenital defect.[2] *E.g., Procanik, supra,* 97 *N.J.* at 342, 478 *A.*2d 755.

Like a cause of action for wrongful birth, a claim based on the doctrine of informed consent is predicated on the patient's

---

[2] Closely related to a claim for wrongful birth is one for "wrongful life." A wrongful life cause of action is "brought by or on behalf of" a child with a defect when negligent medical treatment deprived his parents of the option to terminate the pregnancy and avoid his birth. *Procanik, supra,* 97 *N.J.* at 347–48, 478 *A.*2d 755. The infant does "not allege that the negligence of defendant doctors caused" the defect from which he suffers, or even that he "ever had a chance to be a normal child." *Id.* at 348, 478 *A.*2d 755. Rather, the "essence of the infant's claim is that the defendant doctors wrongfully deprived his mother of information that would have prevented his birth." *Ibid. See Siemieniec v. Lutheran Gen. Hosp.,* 117 *Ill.*2d 230, 111 *Ill.Dec.* 302, 512 *N.E.*2d 691, 695 (1987) (indicating that wrongful life case may be premised on same type of negligent acts as underlie wrongful birth claim). Damages for wrongful life, like those for wrongful birth, consist of "the medical expenses attributable to [the infant's] birth defects." *Procanik, supra,* 97 *N.J.* at 352, 478 *A.*2d 755. Expressly excepted from compensable damages is a valuation of the non-existence of the child as compared to the child's existence in an impaired state. *See Berman, supra,* 80 *N.J.* at 429–30, 404 *A.*2d 8; *see also Bruggeman v. Schimke,* 239 *Kan.* 245, 718 *P.*2d 635, 642 (1986) (refusing to recognize cause of action for wrongful life because infant with defect has suffered no legally cognizable wrong by being born); *Elliott v. Brown,* 361 *So.*2d 546, 548 (Ala.1978) (refusing to recognize

right to self-determination. The doctrine of informed consent is rooted in the premise that "every human being of adult years and sound mind has a right to determine what shall be done with his own body." *Canterbury v. Spence*, 464 *F*.2d 772, 780 (D.C.Cir.), *cert. denied*, 409 *U.S.* 1064, 93 *S.Ct.* 560, 34 *L. Ed.*2d 518 (1972) (internal quotation and citation omitted); *see also Baird v. American Med. Optics*, 155 *N.J.* 54, 79, 713 *A.*2d 1019 (1998) (O'Hern, J., dissenting) (observing that informed consent is "dignitary tort" preserving patient's "rights of self-determination and personal integrity"). Informed consent doctrine requires a plaintiff to prove that the undisclosed risk was medically accepted and material, that a reasonably prudent person in the patient's condition would not have undergone the treatment if aware of the risk, and that the risk came to fruition. *See Canterbury, supra,* 464 *F*.2d at 791.

 Informed consent doctrine imposes on the physician a duty to disclose "such information as will enable the patient to make an evaluation of the nature of the treatment and of any attendant substantial risks, as well as of available options in the form of alternative therapies." *Largey v. Rothman,* 110 *N.J.* 204, 208, 540 *A.*2d 504 (1988). That duty of disclosure rejects the "reasonable physician" standard and focuses on the material risks a "prudent patient" would want to know before making a medical decision.[3]

 In informed consent cases, proximate cause requires the plaintiff to prove that a reasonably prudent patient in the

---

cause of action for wrongful life because "a legal right not to be born is alien to the public policy of [Alabama] to protect and preserve human life").

[3] The Court stressed the "strong conception of a patient's right of self-determination" as the basis for the prudent-patient standard governing the duty of disclosure, *viz:*

Perhaps the strongest consideration that influences our decision in favor of the "prudent patient" standard lies in the notion that the physician's duty of disclosure "arises from phenomena apart from medical custom and practice": the patient's right of self-determination. The foundation for the

plaintiff's position would have declined to undergo the treatment if apprised of the risks that the defendant negligently failed to disclose. *Id.* at 215–16, 540 *A.*2d 504. In addition, because damages in informed consent cases include the harm or physical injury to the patient, there must be medical causation, that is, a causal connection between the undisclosed risk and the injury ultimately sustained. *Grasser v. Kitzis,* 230 *N.J.Super.* 216, 221–22, 553 *A.*2d 346 (App.Div.1988) (noting that in informed consent cases where plaintiff suffers injury during surgery, plaintiff establishes proximate causation by making two showings: (1) prudent patient would have refused consent if full and adequate disclosure had been made, and (2) injury suffered was related to operation and did not occur spontaneously or by independent means); *see also Canterbury, supra,* 464 *F.*2d at 790 (noting that "[a]n unrevealed risk that should have been made known must materialize, for otherwise the omission, however unpardonable, is legally without out consequence").

■ These principles apply in informed consent cases that involve the prescription of drugs. Hence, the test of proximate cause in such cases requires that the plaintiff establish a causal relation between the prescribed drug about which she was inadequately warned and the harm that materialized. *See, e.g., Niemiera v. Schneider,* 114 *N.J.* 550, 554, 555 *A.*2d 1112 (1989) (stating in failure-to-warn medical malpractice case involving administration of vaccine, "fundamental underlying question" is whether vaccine "was the cause of" plaintiff's brain damage); *Eppel v. Fredericks,* 203 *A.D.*2d 152, 610 *N.Y.S.*2d 254 (1994) (holding that in order to establish *prima facie* case for failure to procure informed consent, plaintiff must establish, among other things, that prescribed drug about which she received inadequate warning

physician's duty to disclose in the first place is found in the idea that "it is the prerogative of the patient, not the physician, to determine for himself the direction in which his interests seem to lie."

[*Largey, supra,* 110 *N.J.* at 214, 540 *A.*2d 504 (quoting *Canterbury, supra,* 464 *F.*2d at 781, 784, 786–87, 789).]

was proximate cause of her injury). That test of medical causation is applicable in an informed consent case even though the harm that materializes is a birth defect. *Ramon v. Farr*, 770 *P*.2d 131, 137 (Utah 1989) (finding that plaintiff failed to establish that child's serious birth defects were caused by doctor's negligent use of anesthesia).

In sum, the informed consent and wrongful birth causes of action are similar in that both require the physician to disclose those medically accepted risks that a reasonably prudent patient in the plaintiff's position would deem material to her decision. What is or is not a medically accepted risk is informed by what the physician knows or ought to know of the patient's history and condition. These causes of action, however, have important differences. They encompass different compensable harms and measures of damages. In both causes of action, the plaintiff must prove not only that a reasonably prudent patient in her position, if apprised of all material risks, would have elected a different course of treatment or care. In an informed consent case, the plaintiff must additionally meet a two-pronged test of proximate causation: she must prove that the undisclosed risk actually materialized and that it was medically caused by the treatment. In a wrongful birth case, on the other hand, a plaintiff need not prove that the doctor's negligence was the medical cause of her child's birth defect. Rather, the test of proximate causation is satisfied by showing that an undisclosed fetal risk was material to a woman in her position; the risk materialized, was reasonably foreseeable and not remote in relation to the doctor's negligence; and, had plaintiff known of that risk, she would have terminated her pregnancy. The emotional distress and economic loss resulting form this lost opportunity to decide for herself whether or not to terminate the pregnancy constitute plaintiff's damages.

## B.

This analysis frames and directs our inquiry into whether plaintiffs have pleaded and proffered evidence sufficient to establish a basis for liability.

That inquiry is initially complicated by the allegations and claims presented by plaintiffs' complaint. On the one hand, plaintiffs' complaint alleges a causal connection between the prescribed Provera and Brandon's birth defect and contains a claim for damages for the defect itself.[4] That comports with a claim based on informed consent. On the other hand, plaintiffs, in different counts and in response to defendants' motion for summary judgment, disclaim damages for the defect itself and insist that they seek to recover only for their injuries as parents, *i.e.*, their own mental and emotional anguish at having lost the opportunity to decide for themselves whether or not to terminate the pregnancy and the special expenses incurred in rearing a child with an impairment. Those claims are typically embraced by a wrongful birth cause of action.

It is not entirely clear whether the only claim the lower courts considered was that seeking to recover damages for the child's impaired condition based on the causal connection between the ingestion of Provera and the birth defect. That claim, regardless of whether it is denominated as one based on informed consent, was properly foreclosed by summary judgment. The record discloses that plaintiffs presented insufficient proof of a causal relationship between the drug and the defect that afflicts their son. That failure of proof would also support summary judgment in favor of defendants to the extent plaintiffs sought damages in the nature of a claim for wrongful life based on their allegation that the drug caused the defect. Similarly, the evidence was insufficient to establish medical causation in support of plaintiffs' additional allegation that Provera caused the retention of a

---

[4] Plaintiffs not only allege, in addition to their wrongful birth claim, that the defendant doctors' negligent prescription of Provera caused Brandon's birth defects, but also that Brandon has a wrongful life claim premised on Provera medically causing his defect. *See* discussion *supra* at 503 n. 2, 730 *A.2d* at 811 n. 2. They further allege that the manufacturers of the drug are also liable under the theory of strict products liability because the drug caused their child's birth defects. The latter two claims are not before us.

defective ovum, leading eventually to the birth of their child with the congenital defect. 295 *N.J.Super.* at 359, 685 *A.2d* 49.

The question remains, however, whether summary judgment was properly entered on the wrongful birth claim. Plaintiffs tried unsuccessfully at the hearings on the summary judgment motion to argue that they had a wrongful birth claim apart from and in addition to their claims based on the allegation that Provera posed the specific risk of bilateral limb reduction and in fact caused that defect. They asserted that they did not restrict their claims only to the specific fetal risk of bilateral limb reduction allegedly posed by Provera and that they did not seek damages only for the impairment suffered by their child; therefore, they were entitled to recover on other grounds that were not dependent on medical causation between the prescribed drug and the resulting birth defect.

Among those "other independent grounds of liability" was defendants' negligent failure "to inform and warn" plaintiffs "that the drug manufacturers issued clear warnings that Provera should *not* be taken during the first four months of pregnancy" and that the PDR required warnings of general "congenital anomalies," and that this negligence, together with other negligent acts, deprived them of the opportunity to terminate the pregnancy. Plaintiffs' attorney summarized this position. While acknowledging that he had "some big problems on the causation" issue, he contended, citing the wrongful-birth decisions of *Berman* and *Procanik, supra,* that he need not prove causation because he was alleging wrongful birth arising from the failure to warn and other negligent acts. He expressly argued that the doctors should have warned plaintiffs and that in failing to do so

> [t]hey didn't give her her chance, all[ ] they had to do was say, "Provera has the possibility of (a) causing fetal abnormalities, generically; (b) of retaining an abnormal fetus rather than spontaneously aborting it; (c) [and] that [there were] indications of mild polyhydramnios[ ] an indication of fetal abnormality," and [their] failure to tell her [of those things] deprived her of her right to abort.

"This particular claim," plaintiffs insisted, "is *not* the more typical case of a failure to obtain informed consent." Although aware of

this argument, the trial court did not determine whether plaintiffs' contentions based on a wrongful birth claim fell beyond the scope of defendants' motion for summary judgment and whether the evidence was sufficient to support a wrongful birth claim. The record provides an adequate basis for making that determination.

The initial analysis based on the record must focus on whether defendants breached a duty. As previously noted, the duty of disclosure in a wrongful birth case is grounded in the right of self-determination. *Supra* at 501–02, 730 *A*.2d at 810–11. The doctor's duty is to *communicate* to the patient enough material information to allow her to make an "informed choice concerning the continuation of pregnancy." Alan B. Handler, *Individual Worth*, 17 *Hofstra L.Rev.* 493, 496 n. 23 (1989); *see Hummel, supra*, 129 *N.J.* at 134, 608 *A*.2d 1341 (Handler, J., dissenting) (patients must "be told about and understand the available options and have all the relevant information necessary to make" a meaningful decision). The test of "materiality" in a wrongful birth case is "whether a 'reasonable patient,' in what the physician knows or should know to be the patient's position, would be 'likely to attach significance to the risk or cluster of risks' in deciding whether to forego the [pregnancy or to bring the fetus to term]." *Bennett v. Surgidev Corp.*, 311 *N.J.Super.* 567, 573, 710 *A*.2d 1023 (App.Div.1998) (citing *Largey, supra*, 110 *N.J.* at 211–12, 540 *A*.2d 504 (quoting *Canterbury, supra*, 464 *F*.2d at 787)). *See Procanik, supra*, 97 *N.J.* at 364, 478 *A*.2d 755 (Handler, J., concurring and dissenting) (indicating physician's general duty of disclosure encompasses material information relating to continuation of pregnancy); Carolyn Lee Brown, *Genetic Malpractice: Avoiding Liability*, 54 *U. Cin. L.Rev.* 857 (1986) (noting in wrongful birth cases importance of condition of individual patient and that "the facts of a given case will play a large part in determining the reasonableness of the physician's response").

The "prudent-patient" standard applicable to a claim for negligent interference with procreative autonomy contemplates a fully informed patient:

> A physician or counselor could reasonably be expected to ascertain enough of a patient's background, [and] her reasons for seeking pregnancy [ ] counseling ... to assess what information might be useful to the patient's deliberative process and then to discuss that information with her. The standard only requires physicians and counselors to make reasonable efforts. They need not be mind readers, as long as they reasonably attend to the circumstances of their individual patients.... The reasonably prudent patient standard thus takes into account each woman's unique circumstances.
>
> [Kathy Seward Northern, *Procreative Torts: Enhancing the Common–Law Protection for Reproductive Autonomy,* 1998 *U. Ill. L.Rev.* 489, 533.]

The physician's obligation, therefore, does not "compel disclosure of *every* risk ... to any [pregnant] patient[,]" but rather only "*material* risks to a *reasonable* patient." *Largey, supra,* 110 *N.J.* at 213, 540 *A.*2d 504. *E.g., Jones v. United States,* 933 *F.Supp.* 894, 902 (N.D.Cal.1996) (holding that military physicians did not have duty to disclose to patient that penicillin they had prescribed for her could interfere with effectiveness of her birth control pills because existence of such drug interaction was unproven and danger of interference occurring appeared to be extremely remote), *aff'd,* 127 *F.*3d 1154 (9th Cir.1997), *cert. denied,* —— *U.S.* ——, 118 *S.Ct.* 2359, 141 *L.Ed.*2d 728 (1998); *Munro v. Regents of the Univ. of Cal.,* 215 *Cal.App.*3d 977, 263 *Cal.Rptr.* 878, 882 (1990) (noting that "it is medically impossible to screen all patients for all known genetic abnormalities"); *Smith v. Cote,* 128 *N.H.* 231, 513 *A.*2d 341, 347 (1986) (holding that physician is not required "to identify and disclose every chance, no matter how remote, of the occurrence of every possible birth 'defect,' no matter how insignificant"). Although the duty of disclosure in wrongful birth cases serves to protect the individual's right of self-determination and personal autonomy, because that duty is premised on principles of civil tort law, the scope of disclosure in a wrongful birth context is' not coextensive with or measured by the woman's constitutional right to decide the fate of her pregnancy. *Cf. Roe v. Wade,* 410 *U.S.* 113, 93 *S.Ct.* 705, 35 *L.Ed.*2d 147 (1973) (holding that woman has constitutionally protected right to determine for any reason or no reason to terminate her pregnancy). The physician's duty to warn is thus limited by what risks a reasonably prudent patient in

the plaintiff's position would consider material to her decision.[5] These constraints serve to place reasonable bounds on the extent of disclosure required by doctors and, so bounded, the standard comports with basic considerations of fairness and public policy that are relevant in determining the scope of a duty of care and the extent of liability that may be placed on the medical profession. *E.g.*, *Carey v. Lovett*, 132 *N.J.* 44, 58–60, 622 *A.*2d 1279 (1993).

■ Applying the standard governing the duty of disclosure, we consider whether the evidence in this case, viewed most favorably for plaintiffs, was sufficient to enable a jury to determine that defendants violated the duty owed plaintiffs. We note preliminarily that the defendant doctors' concession of negligence or breach of duty was made only for the limited purpose of the summary judgment motion below so that the trial court could determine whether plaintiffs had satisfied the test of proximate

---

[5] The medical probability of the risk manifesting in the patient is highly relevant to whether a reasonably prudent patient would consider the risk material or not. A number of factors, referred to as "maternal indicators," have been recognized and accepted as material in determining whether a risk should be disclosed to a particular pregnant patient. Sylvia Schild & Rita Beck Black, *Social Work and Genetics: A Guide for Practice* 40 (1984). Accepted maternal indicators include exposure to drugs, irradiation, or infection; diabetes, mental retardation, or PKU; a familial pattern of inherited disorders; metabolic or biochemical disorders; known or suspected chromosomal abnormalities; multiple miscarriages or still births; infertility; consanguinity or incest; previous child with any kind of genetic abnormality; age over 35; possession of a recessive gene; and membership in an ethnic group at risk for a certain defect (*i.e.*, African–Americans and sickle cell anemia; Ashkenazi Jews and Tay Sachs Syndrome). *Ibid.;* Julie Gantz, Note, *State Statutory Preclusion of Wrongful Birth Relief: A Troubling Re–Writing of a Woman's Right to Choose and the Doctor–Patient Relationship*, 4 *Va. J. Soc. Pol'y & L.* 795, 814 (1997); *see* Michael J. Malinkowski, *Coming Into Being: Law, Ethics, and the Practice of Prenatal Genetic Screening*, 435 *Hastings L.J.* 1435, 1442, 1450 (1994) (noting that there are 3000–4000 known genetic defects and more genetic anomalies responsible for health impairments will be identified as research continues and Human Genome Project proceeds; noting further that for some defects such as cystic fibrosis (which can be caused by mutation in any one of up to 230 genes), it is impossible to perform all tests necessary to ensure detection).

causation in the context of a claim based on the principles of informed consent doctrine. That concession, therefore, does not extend to the determination of plaintiffs' wrongful birth claim.

Plaintiffs contend that the PDR, which contained specific warnings that Provera could cause bilateral limb reduction, the retention of a defective ovum, and general genetic anomalies, constituted evidence of the standard of care governing the doctors' duty of disclosure. In determining what constitutes a medically accepted risk when defining a doctor's duty to warn, we have recognized that the PDR, standing alone, is not and should not be the touchstone of what risks a physician must reveal to his or her patient. *See Morlino v. Medical Ctr. of Ocean County*, 152 *N.J.* 563, 580, 706 *A.*2d 721 (1998) (holding that because PDR warnings are written "for many reasons including compliance with FDA requirements, advertisement, the provision of useful information to physicians, and an attempt to limit the manufacturer's liability[,]" PDR warning alone does not establish physician's duty of care). Thus, the fact that the PDR contained warnings of the general and specific risks Provera posed to the fetus is not, of itself, sufficient evidence to establish a standard of care.

Plaintiffs, however, do not rely solely on the PDR to establish the standard of care. They present additional evidence that fetal deformity was a medically accepted risk of which they should have been informed. Dr. William Vilensky, one of plaintiffs' experts, noted in his report that the standard of care required that, under circumstances such as were present in this case, the patient be informed of the PDR warnings. Similarly, Dr. Deborah Consoli, plaintiffs' second expert, testified that in 1991 the medical community was split concerning whether Provera caused limb reduction and that she, therefore, informed her patients of the risk. Moreover, both defendant doctors had actual knowledge of plaintiff's personal concern about having taken Provera while pregnant. The doctors, however, did not explain to plaintiff whether there were any risks posed by or associated with the ingestion of Provera that were recognized by the medical community or a substantial segment thereof, or whether those risks were remote

or likely, or could result in severe or mild impairments. Instead, the doctors dismissed her personal concerns and told her "not to worry."

In addition, plaintiff exhibited other "maternal indicators."[6] The record discloses evidence that plaintiff was spotting, one of the fetal twins died *in utero*, and an amniocentesis revealed polyhydramnios,[7] which is a possible indicator of fetal abnormality. Defendants' own expert admitted that there were signs that "suggested that this was an abnormal pregnancy." Plaintiffs' evidence also showed that a diagnostic procedure that could have detected whether the potential defect had in fact materialized was available and yet was not utilized until so late in the pregnancy that detection was unlikely.[8] Defendants did not inform plaintiffs of the availability of this diagnostic test nor did they administer that test during the critical period of her pregnancy. As her pregnancy progressed and more maternal risks appeared, the evidence would sustain the determination that Dr. Loewe, instead of keeping plaintiff properly apprised of the status of her pregnancy, chose to keep her in the dark. Given these maternal indicators, the doctors should have known that a reasonable prudent patient in this woman's position would have likely attached significance to the risks associated with Provera.[9] In sum, there was

---

[6] Even though the experts did not characterize the factors indicative of medical problems with the pregnancy as "maternal indicators," the factors they found relevant are consistent with those indicators. *See supra* at 511 n. 5, 730 A.2d at 816 n. 5.

[7] Polyhydramnios is an excessive amount of amniotic fluid. *Stedman's Medical Dictionary* 1118 (5th unabr. lawyer's ed.1982).

[8] Plaintiffs' expert, Dr. Consoli, maintained that the standard of care, in light of the polyhydramnios and the fact that Provera was contraindicated for pregnant women, required a physician to conduct a targeted Level II ultrasound at 20–22 weeks to verify whether the specific anomalies listed in the PDR were in fact present. Dr. Loewe did not perform this test until week 33–34, when the fetus was so large that digital deformity was able to go undetected.

[9] The dissent contends that our reference to maternal indicators suggests that defendant doctors are liable for "a failure to diagnose Brandon Canesi's birth

sufficient evidence to enable a jury to determine that defendants breached their duty of disclosure.

The evidence, we find, was also sufficient to establish proximate cause. The dissent accuses the Court of "eliminat[ing] proximate cause" altogether, or, alternatively, "redefin[ing] it beyond recognition." *Post* at 526, 730 *A.2d* at 824. That simply is not the case.

■ Legal or proximate cause is clearly an essential element of a wrongful birth cause of action. Medical causation, however, is not. The dissent, by insisting that medical causation is a requirement, unduly burdens a patient's wrongful birth claim that does not seek recovery for the congenital impairment. There is sound authority explaining why medical causation is not a requirement in wrongful birth causes of action. The failure to establish medical causation of the child's injury historically was viewed as a ground warranting the dismissal of wrongful birth actions. Stephanie S. Gold, Note, *An Equality Approach to Wrongful Birth Statutes*, 65 *Fordham L.Rev.* 1005, 1013 (1996). In order to prove causation, a plaintiff had to prove that the physician caused the anomaly in the child. *Ibid;* Anthony Jackson, *Action for Wrongful Life, Wrongful Pregnancy, and Wrongful Birth in the United States and England*, 17 *Loy. L.A. Int'l & Comp. L.J.* 535, 560 (1995). Over time, however, it was recognized that the nature of the tort of wrongful birth does not depend on whether a defendant caused the injury or harm to the child. Rather, the appropriate inquiry was viewed as whether the defendant's negligence was the proximate cause of the parents' loss of the option to make an informed and meaningful decision either to terminate the pregnancy or to

---

defect." *Post* at 539, 730 *A.2d* at 832. The term "maternal indicators" is an expression that simply describes symptoms of material maternal risks. Acknowledgement of the existence of those indicators does not presume liability. Rather, in the context of this case, they are demonstrative of whether a reasonable patient, evidencing symptoms such as spotting, the death of a fetal twin and excessive amniotic fluid, would be particularly concerned with fetal risks in general, as well as any associated with Provera.

give birth to a potentially defective child. Brenda L. Kimble, *Wrongful Birth: A Practitioner's Guide to a New Arrival*, 55 *Ala. Law.* 84, 88 (1994). Today, "most courts [ ] recognize the distinction between causing [a birth defect] and causing the parents to lose the option to terminate the pregnancy, [and] the latter causation standard is widely accepted in jurisdictions recognizing wrongful birth actions." Gold, *supra*, at 1013 (citing *Robak*, *supra*, 658 *F*.2d at 477; *Keel*, *supra*, 624 *So*.2d at 1027).

The appropriate proximate cause question, therefore, is not whether the doctor's negligence caused the fetal defect; the congenital harm suffered by the child is expressly not compensable. Rather, the determination to be made is whether the doctors' inadequate disclosure deprived the parents of their deeply personal right to decide for themselves whether to give birth to a child who could possibly be afflicted with a physical abnormality. There is sufficient evidence in the record of this case to enable a jury to make that determination.

In addition, in establishing proximate cause for wrongful birth, plaintiffs must show that the resulting birth defect was reasonably foreseeable, that is, not too remote in relation to defendants' negligence, and that had defendants not been negligent, the pregnancy would have been terminated. *See, e.g., Berman, supra*, 80 *N.J.* at 426, 404 *A*.2d 8 (imposing liability for wrongful birth on premise that proximate cause was met where plaintiff, once notified that her child, if born, would have been afflicted with Down's Syndrome, would have terminated pregnancy); *Haymon v. Wilkerson*, 535 *A*.2d 880, 882 (D.C.1987) (holding that plaintiff must establish that had she learned of impairment during her pregnancy, she would have terminated pregnancy); *Proffitt v. Bartolo*, 162 *Mich.App*. 35, 412 *N.W.*2d 232, 237 (1987) (holding that plaintiff satisfies causation by showing that in absence of defendant's negligence, she would have obtained abortion); *Smith, supra*, 513 *A*.2d at 347 (holding that chain of causation is not too remote where plaintiff claims she would have aborted fetus had she learned of impairment). The record reveals

sufficient evidence to support the determination of proximate cause under that standard. The evidence indicates that defendants' negligence consisted of a combination of the failure to warn and the failure to diagnose. As a result, there existed the unwarned and undetected risks of fetal deformity—"congenital anomalies" (according to the PDR)—including bilateral limb reduction. Further, the record discloses that plaintiff had specific concerns about her treatment and condition and had indicated that, when faced in an earlier pregnancy with the possibility of a defective fetus, she in fact did have an abortion. Such evidence would support the determination that the risks to which plaintiff was exposed were material and that she would have terminated her pregnancy had those risks been communicated to her or had they been diagnosed.

The dissent follows the Appellate Division's reasoning that in the absence of a requirement of "medical causation" in a wrongful birth case, such as this, plaintiffs might recover for a "chance occurrence," 295 *N.J.Super.* at 364, 685 *A.2d* 49, leading to its assertion that doctors will be made guarantors against birth defects. *Post* at 530–31, 730 *A.2d* at 826–27. That position is inaccurate and exaggerated. In voicing that concern, the dissent relies on our own wrongful birth cases, noting the apparent factual connection between the undisclosed and undiagnosed risks and the congenital defect that occurred. *Post* at 526–27, 730 *A.2d* at 824. The dissent suggests, therefore, that these cases require that the malpractice be a medical cause or a cause-in-fact of the child's birth defect. These decisions, however, do not require proof that the doctor's malpractice constitutes the medical cause of the child's defect, only that the defect was a foreseeable risk posed by the malpractice.[10] These cases present the circumstance of a

---

[10] The dissent professes to disclaim any requirement that the doctor's failure medically caused the child's defect, writing that "a wrongful birth action based on the doctor's failure to warn requires only the occurrence of the unwarned risk." *Post* at 525, 730 *A.2d* at 823. The dissent, however, defines the risk in this case to include a medical causation requirement—the birth defect in this

factual similarity or parallel between the unwarned or undetected risk and the birth defect that eventuated. That circumstance serves only to support the finding that the resulting birth defect was not too remote in relation to the doctor's omission as an element of proximate cause. These cases do not require that the omission be causally related to the defect. The circumstance of the similarity between the unwarned and undetected risk and the ultimate defect was not used to establish medical causation, which, we acknowledge, it does not do; nor was it invoked as a substitute for medical causation, which, we repeat, is not required. Rather, the circumstance is one that is relevant to the jury's determination of legal or proximate cause: whether the birth of a child with a defect was a material risk that was reasonably foreseeable and was itself a result that was not too remote in relation to the doctor's failure to apprise the parents of that risk during the pregnancy.

 Finally, we turn to the issue of the sufficiency of the evidence relating to damages. As noted, a woman asserting a wrongful birth claim who proves that she herself would have had an abortion if apprised of the risk of fetal defect is entitled to damages consisting of both the special medical expenses attribut- able to raising a child with a congenital impairment, *see Schroeder, supra,* 87 *N.J.* at 70, 432 *A.*2d 834, and the emotional injury

---

case was a "chance occurrence" only because of the lack of that causal relationship, *viz.:*

> In this case, the unwarned risk was that Provera might *cause* birth defects. Provera, however, was not the *cause* of Brandon Canesi's limb reduction, the only defect that materialized. In fact, Provera did not *cause* any birth defects.

[*Post* at 525, 730 *A.*2d at 823 (emphasis added).]

The dissent also implies that our holding in this case would support a finding of liability in a wrongful birth case in which the eventual harm was completely different from and unrelated to the bases for the physician's negligence. That characterization of our holding is inaccurate. This record clearly demonstrates a sufficient connection or parallel between the various allegations of physician negligence and the resulting harm to the infant, and warrants submission of plaintiff's wrongful birth claim to a jury.

attributable to the deprivation of "the option to accept or reject a parental relationship with the child[,]" *Berman, supra,* 80 *N.J.* at 433, 404 *A.*2d 8. Defendants' motion for summary judgment and the rulings of the lower court sustaining that motion did not purport to determine or foreclose those claims for damages.

## III

We affirm in part and reverse in part and remand to the trial court to proceed in accordance with this opinion.

O'HERN, J., concurring.

In formal logic, the technique of setting up an argument that does not exist and then refuting that misrepresented argument is called the "straw man" fallacy. *See* Douglas Walton, *A Pragmatic Theory of Fallacy* 57 (1995). The straw man technique is fallacious because it leads to irrelevancies and because it precludes the development and resolution of the true issues of contention. *See* Madsen Pirie, *The Book of the Fallacy* 160 (1985).

[Philip M. Nichols, *Realism, Liberalism, Values, and the World Trade Organization,* 17 *U. Pa. J. Int'l Econ. L.* 851, 882, n. 20 (Fall 1996).]

In this case our dissenting member has set up an argument that does not exist and then has proceeded to refute it. The false premise of the dissent is contained in its first sentence: "The majority holds that a physician who fails to warn a pregnant woman of a potential adverse effect of a prescribed drug virtually insures that her child will be born without birth defects from any cause." *Post* at 520, 730 *A.*2d at 821, Pollock, J., dissenting.

Not so. This case concerns the eventual manifestation of the specific defect about which the physician had an acknowledged duty to warn his patient. The Court's opinion does not create an open-ended liability for obstetricians whenever a birth defect occurs. For liability to be imposed, the birth defect must be parallel to the undisclosed material risk concerning which the physician had a duty to warn, taking into account the maternal indicators of the patient. *Ante* at 505–06, 730 *A.*2d at 812–13, Handler, J. We would not sustain a cause of action, for example,

if Brandon had been born with a hereditary hip dislocation, a condition totally unrelated to the unwarned risk.

Considering the "maternal indicators" of this patient, she should have been warned that taking Provera during early pregnancy posed the risk of congenital anomalies, including congenital heart defect and limb reduction. *Ante* at 513–14, 730 *A.*2d at 817, Handler, J. Recall that this patient specifically inquired about the risks of having taken Provera during early pregnancy·and was told "not to worry." *Ante* at 513, 730 *A.*2d at 817, Handler, J. When the birth defect that occurs is the very one about which warning should have been given, it cannot fairly be charged that the Court has "eliminated proximate cause" from a wrongful birth analysis. *Post* at 533, 730 *A.*2d at 828, Pollock, J., dissenting.

It may be that science is unable to establish to a reasonable degree of medical certainty that Provera was the cause in fact of Brandon's condition. That does not detract from the reality that the risk was one about which the patient should have been warned and that was the risk that eventuated. Science still cannot pinpoint the cause of cancer. Yet, men and women will want to avoid the risk of cancer by avoiding those substances that are believed to increase the risk of its occurrence. So too Melissa Canesi was entitled to know if certain substances were believed to pose or increase a risk that her child would be born with a limb reduction.

Even if the extent of the risk is not scientifically certain, some women will simply not risk ingesting a substance that could have such side effects. Consider, for example, the recent debate about silicone breast implants. Although frequently associated with the incidence of cancer, a definitive link has not been established to the satisfaction of many scientists. "Science Panel Members Explain Methodologies, According to Deposition Transcripts," 7 No. 12 *Mealy's Litig. Rep.: Breast Implants* 4 (May 13, 1999).

"In suits over silicone breast implants, ... some argue that evidence of causation is lacking, but that does not mean a causal link does not exist. It means that we might not have found it yet because the scientific process is limited by its theories, its tools and time." Roman M. Silberfeld, *Scientific Law of Unintended Consequences, Nat'l L. J.*, Jan. 19, 1998, at A22. Persistent scientific debate would not relieve a physician performing a breast implant procedure of a duty to warn a patient that the risk existed.

In short, this case is not about a birth defect unrelated to the physician's breach of the duty to warn. This case is about the occurrence of one of the very risks about which there was a legal duty to warn. It is not as though the record established that there was some other cause, genetic or environmental, that caused the defect. However difficult it may be to prove the etiology, Brandon's birth defect appears to have been a case of the unwarned risk coming to pass.

POLLOCK, J., dissenting.

The majority holds that a physician who fails to warn a pregnant woman of a potential adverse effect of a prescribed drug virtually insures that her child will be born without birth defects from any cause. I respectfully dissent.

Under the majority opinion, the parents of a child born with congenital defects may maintain a wrongful birth action against physicians who failed to warn the mother of the potential adverse effects of a drug that did not cause the defects. The import of the holding is that the parents need not prove that the drug was the proximate cause of the birth defects that give rise to the action. All the mother need prove is that she would have aborted the fetus if apprised of potential risks, even if the risks never materialized. Both the reasoning and the result of the majority opinion are flawed.

## I.

Because this appeal arises from the grant of summary judgment for defendants, plaintiffs' version of the facts and all favorable inferences that may be drawn therefrom are assumed to be true. *See Brill v. Guardian Life Ins. Co.,* 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995); *Pierce v. Ortho Pharm. Corp.,* 84 *N.J.* 58, 65, 417 *A.*2d 505 (1980). So viewed, the facts support the following summary.

In June 1991, Melissa Canesi (Canesi) was twenty-nine years old, married, and the mother of one child. When she missed her menstrual period that month, she feared that she might be pregnant.

A home pregnancy test indicated that Canesi was not pregnant. She nonetheless consulted defendant, Dr. James Wilson, on July 1, 1991. For the purpose of this appeal, Canesi concedes that she did not become pregnant until shortly after that date.

Dr. Wilson administered a urinalysis pregnancy test, which indicated that Canesi was not pregnant. To restart her menstrual cycle, Dr. Wilson prescribed ten Provera tablets, to be taken one per day. After taking eight of the tablets without success, Canesi again consulted Dr. Wilson.

On July 15, Dr. Wilson administered a blood serum test, which indicated that Canesi was pregnant; in fact she was carrying twins. Although Canesi expressed to Dr. Wilson a concern about the use of drugs during her pregnancy, he told her not to worry. On two prior occasions, Canesi had aborted pregnancies, once because of a concern about the side effects of painkillers and x-rays administered in connection with a broken leg.

Because Dr. Wilson was not a participating physician in Canesi's health plan, she next consulted Dr. Ronald Loewe. On July 25, Canesi told Dr. Loewe that she was pregnant and that she had taken Provera. Like Dr. Wilson, Dr. Loewe told Canesi that she need not be concerned about the drug. For reasons unrelated to the ingestion of Provera, Canesi experienced spotting and mild polyhydramnios (the presence of excessive amniotic fluid) during

her pregnancy. One of the two fetuses that she was carrying died and was spontaneously aborted.

When Canesi consulted the two doctors in 1991, the medical profession was divided over the effects of Provera during pregnancy. In that year, the drug manufacturer, Upjohn, included in the *Physicians' Desk Reference* (PDR) 2251 (45th ed. 1991), a warning that the use of Provera was "not recommended" during the first four months of pregnancy. The warning stated that if a pregnant woman took Provera during that time, she should be told of the risk to her fetus of congenital anomalies, including possible "limb reduction defects," and the risk of delay in the spontaneous abortion of defective fertilized ova. *Ibid.* For the purpose of this appeal, both doctors concede that they had a duty to warn Canesi of those risks. They further concede that they did not warn her.

Subsequent scientific research revealed that Provera neither causes nor increases the risk of limb reduction defects. Consequently, in 1993, Upjohn deleted its warning about those defects from the PDR.

Consistent with the elimination of the warning, defendants' expert, Dr. A.F. Haney, Professor of Obstetrics and Gynecology at Duke University Medical Center, found "no scientific basis for limb reduction with exposure to progestins," such as Provera. Dr. Haney explained that early reports of an "association" between Provera and limb reduction defects were based on "very bad epidemiology." He concluded:

> When careful analysis was performed, it became very obvious there was no scientific information whatsoever to support any association of limb reduction with progestins of any kind.... As a consequence, this patient and her family have been [misled] into thinking there is some potential association. It's certainly understandable for them [to] try and find a cause for their child's anomaly. The one thing that can clearly be said is that this is not related to the 10 days of Provera she took during [the] luteal phase of her conceptive cycle.

Plaintiffs' experts, Dr. William Vilensky and Dr. Deborah P. Consoli, likewise declined to attest to any connection between Provera and limb reduction defects. Specifically, Dr. Vilensky testified that he could not render any opinion about a causal

relationship. Dr. Consoli, after conceding that current medical knowledge does not support a causal connection, stated that she no longer warned her own patients that Provera potentially could cause limb reduction. She testified that the warning was unnecessary

[b]ecause I think overall, I think medical-legally, you know, the warning has been taken out of the PDR and just in general the literature doesn't support that anymore, and I would tell them, because I'm conservative, I would tell them that years ago we used to warn people and at this point most doctors generally feel there is no support for that but I would warn them about cardiovascular [problems], that that still is a possibility.

The PDR still warns against taking Provera during the first four months of pregnancy. *See* PDR 2110–11 (49th ed. 1995). According to the PDR, if a pregnant woman is exposed to Provera, she should be apprised of two potential risks: possible genital abnormalities in the fetus and possible delay in spontaneous abortion of defective fertilized ova. *Ibid.* Neither of those two potential risks eventuated in this case. On March 18, 1992, Canesi gave birth to plaintiff Brandon Canesi, who was born with bilateral limb reduction of the hands.

Canesi and her husband (jointly described as "the Canesis"), filed a wrongful birth action in which they claimed that Drs. Wilson and Loewe, by failing to warn of the risks that Provera posed to a fetus, had deprived them of the right to abort Brandon. The Canesis claimed that Provera had caused Brandon's limb reduction and that the two doctors had been negligent in failing to warn them of the limb reduction risk. In a separate count, which is not before us, the Canesis asserted a claim on Brandon's behalf for his "wrongful life."

The Law Division granted the doctors' motion for summary judgment, reasoning that the Canesis had failed to establish that Provera had caused Brandon's limb reduction or that the ingestion of Provera was related in any way to the defect. The trial judge also observed that expert testimony was required to support a claim that Canesi's fertilized ova were defective or that Provera caused a delay in her spontaneous abortion of one of them. In the

absence of any supporting expert testimony, the trial court correctly discounted those claims.

The Appellate Division likewise found that the record contained no evidence that Provera had caused or increased the risk of limb reduction. 295 *N.J.Super.* 354, 359–60, 685 *A.*2d 49 (App.Div. 1996). The court stated: "[I]t is clear in this case that if the fetus had been aborted because of the concerns expressed in the PDR, it would have been based on a medical premise now found to be fallacious." *Id.* at 362, 685 *A.*2d 49.

## II.

### A.

The majority acknowledges that proximate cause is an essential element of an action based on a physician's failure to obtain a patient's informed consent. *Ante* at 504–05, 730 *A.*2d at 812–13. It also acknowledges the strong similarities between an action based on lack of informed consent and a wrongful birth action based on a physician's failure to warn. *Id.* at 506, 730 *A.*2d at 813. Specifically, the majority recognizes that wrongful birth claims, as well as those based on lack of informed consent, stem from a patient's right of self-determination. *Id.* at 503–04, 730 *A.*2d at 812. With both claims, a cause of action accrues when a physician denies a patient information necessary to make an informed decision.

As the majority notes, a wrongful birth action does not require proof that the physician's negligence caused the birth defect. *Id.* at 506, 730 *A.*2d at 813. Physicians may be liable for the failure to detect a birth defect simply because the failure deprives the mother of her right to choose to abort. Similarly, they may be liable for the failure to warn about a birth defect related to the mother's age or genetic makeup rather than to any aspect of her medical care.

Contrary to the majority opinion, nothing in this dissent requires proof that the doctor's failure caused the child's defect. *Id.* at 514–15, 730 *A.*2d at 817–18; *see also id.* at 502–03, 730 *A.*2d at 811. The dissent recognizes that a wrongful birth action based on the doctor's failure to warn requires only the occurrence of the unwarned risk. In this case, the unwarned risk was that Provera might cause birth defects. Provera, however, was not the cause of Brandon Canesi's limb reduction, the only defect that materialized. In fact, Provera did not cause any birth defects.

The majority opinion identifies different elements of proof of proximate cause for informed consent and wrongful birth actions. *Id.* at 504–06, 730 *A.*2d at 812–13. In an informed consent action, a plaintiff must "meet a two-pronged test of proximate causation: she must prove that the undisclosed risk actually materialized and that it was medically caused by the treatment." *Id.* at 506, 730 *A.*2d at 813. In a wrongful birth action, in contrast,

> a plaintiff need not prove that the doctor's negligence was the medical cause of her child's birth defect. Rather, the test of proximate causation is satisfied by showing that an undisclosed fetal risk was material to a woman in her position; the risk materialized, was reasonably foreseeable and not remote in relation to the doctor's negligence; and, had plaintiff known of that risk, she would have terminated her pregnancy.

*[Id.* at 506, 730 *A.*2d at 813.]*

According to the majority, "medical causation" is not an element of proximate cause in a wrongful birth action. *Id.* at 514–17, 730 *A.*2d at 817–19. Thus, the majority finds irrelevant the fact that Provera did not cause Brandon's limb reduction. *See id.* at 507–08, 730 *A.*2d at 814. For the majority, it suffices that the doctors failed to warn of the risk of birth defects that Provera did not cause or of other risks that did not result in defects.

Loss of choice is also an essential element of an informed consent action. The physician's failure to explain the risk of a course of treatment, like the failure to disclose the risk of a potential birth defect, deprives the patient of the right to make a

choice that is informed. Thus, in both informed consent and wrongful birth actions, the injury is the patients' loss of the opportunity "to determine for [themselves] the direction in which [their] interests seem to lie." *Canterbury v. Spence,* 464 *F.*2d 772, 781 (D.C.Cir.1972).

### B.

The majority opinion acknowledges that "[l]egal or proximate cause is clearly an essential element of a wrongful birth cause of action." *Ante* at 514, 730 *A.*2d at 817. It redefines "proximate cause," however, to permit parents to recover for a child's wrongful birth even if the alleged negligence of the physicians is unrelated to the child's defects. The opinion's rhetoric is seductive and its reasoning subtle; its result is extraordinary. Depending on one's interpretation, the majority either eliminates proximate cause, a result that the opinion disavows, *id.* at 514, 730 *A.*2d at 817, or redefines it beyond recognition. Either alternative, in my opinion, is wrong.

Because the difference between the majority and dissenting opinions turns on so elemental a point, a brief review of fundamental principles might illuminate our differences. At the risk of stating the familiar, basic negligence law requires "not only that the actor's conduct be negligent toward the other, but also that the negligence of the actor be a legal cause of the other's harm." *Restatement (Second) of Torts* § 431 (1965); *Prosser & Keeton on Torts,* § 41 & n. 14 (5th ed.1984). Causation often is described as consisting of "cause in fact" or "but for" causation, and "legal cause" or "proximate cause." *Id.* § 41.

Cause-in-fact or but-for causation encompasses every occurrence related to an event such that, but for the occurrence, the event would not have happened. *See, e.g., ibid.* By itself, but-for causation generally is an inefficient and unfair means of allocating liability. As one leading text states:

It should be quite obvious that, once events are set in motion, there is, in terms of causation alone, no place to stop. The event without millions of causes is simply

inconceivable; and the mere fact of causation ... can provide no clue of any kind to singling out those which are to be held legally responsible.

[*Ibid.*]

Proximate cause, on the other hand, confines responsibility to acts that are so closely related to a result as to justify the imposition of liability. Ultimately, a finding of proximate cause depends on considerations of fairness, justice, and public policy. *Williamson v. Waldman,* 150 *N.J.* 232, 245–46, 696 *A.*2d 14 (1997); *Cowan v. Doering,* 111 *N.J.* 451, 466, 545 *A.*2d 159 (1988); *Brown v. United States Stove Co.,* 98 *N.J.* 155, 173, 484 *A.*2d 1234 (1984); *Johnson v. University Hosps.,* 44 *Ohio St.*3d 49, 540 *N.E.*2d 1370, 1377 (1989).

The differing views of causation represented by the majority and dissenting opinions reflect deeper differences about the imposition of liability for the legal consequences of a physician's conduct. Here, the doctors' alleged failure to warn about the risks posed by Provera is a but-for, but not a proximate cause of Canesi's lost opportunity to elect to abort. Their failure is a but-for cause of Brandon's birth in that but for their impairment of Canesi's lack of choice, Brandon would not have been born. It is also a but-for cause of Brandon's defects because but for his birth, Brandon would not have been born with birth defects. For the failure to warn to constitute a proximate cause, however, more is required. *Restatement (Second) of Torts, supra,* § 431 comment a.

Before today, this Court has limited the right to recover in wrongful birth actions to claims that a doctor's failure to detect or to warn of a birth defect resulted in the birth of a child with that specific defect. *See Procanik v. Cillo,* 97 *N.J.* 339, 478 *A.*2d 755 (1984) (doctor failed to diagnose mother's rubella; child born with congenital rubella syndrome); *Schroeder v. Perkel,* 87 *N.J.* 53, 432 *A.*2d 834 (1981) (doctor failed to diagnose genetic defect resulting in cystic fibrosis in older child; second child born with cystic fibrosis); *Berman v. Allan,* 80 *N.J.* 421, 404 *A.*2d 8 (1979) (doctor failed to warn 38–year–old woman of increased risk, due to her age, that her child would be born with Down's Syndrome; child

born with Down's Syndrome). Implicit in that limitation is the recognition that a failure to diagnose or to warn does not cause the birth defect. The doctor's failure, however, can deprive the mother of her ability to choose not to give birth to a child with the very defect about which the doctor should have warned her. In such wrongful birth actions, the Court therefore has found that the doctor's malpractice was the proximate cause of the parents' injury. *See, e.g., Schroeder, supra,* 87 *N.J.* at 53, 432 *A.*2d 834. Satisfaction of the requirement of proximate cause confines the liability of physicians to consequences that are sufficiently related to their failure to justify imposing on them the costs of the breach.

It is one thing to impose liability for a child's congenital rubella syndrome on a doctor who failed to diagnose rubella in the child's mother, *Procanik;* for a child's cystic fibrosis on a doctor who failed to test a symptomatic sibling for that genetic disease, *Schroeder;* or for a child's Down's Syndrome on a doctor who failed to warn a pregnant woman that her age put her at increased risk of delivering a child with that condition, *Berman.* It is quite another to impose liability for prescribing a drug that had no connection with a birth defect. In one case, the condition is the foreseeable result of the doctor's omission; in the other, it is not.

The majority's result is unprecedented in any jurisdiction. In every previous failure-to-warn case, the harm about which the doctors failed to warn was the harm that in fact occurred. *See, e.g., Estate of Doe v. Vanderbilt Univ.,* 824 *F.Supp.* 746 (M.D.Tenn.1993) (holding medical providers who failed to warn mother about danger of exposure to HIV liable when baby born with HIV); *Phillips v. United States,* 575 *F.Supp.* 1309 (D.S.C. 1983) (finding parents entitled to damages where doctor failed to advise and counsel them of risk of Down's syndrome, and child born with Down's syndrome); *Siemieniec v. Lutheran Gen. Hosp.,* 117 *Ill.*2d 230, 111 *Ill.Dec.* 302, 512 *N.E.*2d 691 (1987) (allowing wrongful birth claim when child born with hemophilia where doctor failed to warn accurately of genetic probabilities of hemophilia); *Proffitt v. Bartolo,* 162 *Mich.App.* 35, 412 *N.W.*2d 232

(1987), *appeal denied,* 430 *Mich.* 860 (1988) (allowing wrongful birth claim when physician failed to diagnose mother's rubella and warn her of dangers; child born with congenital rubella syndrome); *Smith v. Cote,* 128 *N.H.* 231, 513 *A.*2d 341 (1986) (same).

Throughout our wrongful birth and wrongful life decisions, the Court has stretched the bonds of logic to achieve fair and reasonable results. *See Procanik, supra,* 97 *N.J.* at 351–52, 478 *A.*2d 755. In *Berman,* while denying recovery to parents for "the medical and other expenses" incidental to raising a child born with Down's syndrome, *Berman, supra,* 80 *N.J.* at 432, 404 *A.*2d 8, the Court allowed recovery for their "mental and emotional anguish upon their realization that they had given birth to a child afflicted with" the condition, *id.* at 433, 404 *A.*2d 8. Two years later in *Schroeder,* we "advance[d] the frontier a little farther" by permitting the parents of a child born with cystic fibrosis to recover the extraordinary medical expenses attributable to that disease. *Schroeder, supra,* 87 *N.J.* at 70–71, 432 *A.*2d 834. Critical to *Schroeder's* extension of damages was the fact that the omitted diagnostic test would have revealed the risk of the disease that caused the medical expenses. The omitted information, although not the cause of the infant's cystic fibrosis, proximately caused the mother to give birth to a child with the disease that engendered the extraordinary expenses. Withholding accurate and useful information, which was directly related to the resulting condition, justified a finding of proximate cause. In the present case, by contrast, the failure to warn concerned a risk, limb reduction, that Provera does not cause. The failure also concerned other risks, such as the retention of a defective ovum, genital abnormalities, and generic other risks. None of those risks materialized.

Here, as in *Berman, Schroeder,* and *Procanik,* the parents' lack of choice is but a link in the chain of events that led to the birth of a child with defects. In contrast to those cases, however, the present case involves a risk that did not materialize and an undisclosed warning based on information now known to be inaccurate.

The majority opinion in effect eliminates the requirement of proximate cause. As the majority explains, a causal connection between the doctors' breach and the plaintiffs' injury is not essential. Instead, "in establishing proximate cause for wrongful birth, plaintiffs must show that the resulting birth defect was reasonably foreseeable, that is, not too remote in relation to defendants' negligence, and that had defendants not been negligent, the pregnancy would have been terminated." *Ante* at 515, 730 *A.*2d at 818. The majority, however, claims that it has retained proximate cause as an element. It justifies the imposition of liability in the absence of a causal connection by asserting that "medical causation" is not an element of a wrongful birth action. *Id.* at 514, 730 *A.*2d at 817. According to the majority, the term "medical causation" means either "a causal connection between the undisclosed risk and the injury ultimately sustained," *id.* at 505, 730 *A.*2d at 812 (quoting *Grasser v. Kitzis,* 230 *N.J.Super.* 216, 221–22, 553 *A.*2d 346 (App.Div.1988)), or "that the drug was the medical cause of the child's congenital impairment," *id.* at 499, 730 *A.*2d at 809. "Medical causation," as used in our prior opinions is an ambiguous term. It may mean either cause-in-fact, *Fiore v. Consolidated Freightways,* 140 *N.J.* 452, 464, 659 *A.*2d 436 (1995), or proximate cause, *James v. Bessemer Processing Co.,* 155 *N.J.* 279, 299, 714 *A.*2d 898 (1998). No matter what "medical causation" means, it cannot be eliminated in this case without also eliminating proximate cause.

Initially, the majority acknowledges the absence of any causal connection between Provera and Brandon's birth defect. *Ante* at 507–08, 730 *A.*2d at 814. Later, however, the majority relies on the "factual similarity or parallel between the unwarned or detected risk and the birth defect that eventuated." *Id.* at 517, 730 *A.*2d at 819. The majority concludes, "This record clearly demonstrates a sufficient connection or parallel between the various allegations of physician negligence and the resulting harm to the infant, and warrants submission of plaintiff's wrongful birth claim

to a jury." *Id.* at 516–17 n. 10, 730 *A.*2d at 819 n. 10. In effect, the majority has substituted parallelism for proximate cause.

For the majority, proximate cause is satisfied in a wrongful birth action because the PDR once included an inaccurate warning of a correlation between Provera and limb reduction defects. Rejected by the majority in its causation analysis is the fact that medical science now accepts that the drug does not cause the defect. That rejection also informs the majority's conclusion that "the risk materialized." For the purposes of determining causation, however, the risk did not "materialize." The unwarned risk was that Provera would cause limb reduction. Nothing in the record establishes that Provera caused Brandon's limb reduction. It follows that the risk did not materialize. The majority is left, as it expressly acknowledges, with a risk that parallels, but is not the proximate cause of Brandon's birth defect.

To support its finding of proximate cause, the majority states that the birth defect was "reasonably foreseeable, ... not too remote ... and that had defendants not been negligent, the pregnancy would have been terminated." *Id.* at 515, 730 *A.*2d at 818. In so defining "proximate cause," the majority confuses the role of foreseeability when determining proximate cause with its role when determining the existence of a duty.

The concept of foreseeability relates to both proximate cause and duty. In negligence cases, including those asserting wrongful birth claims, the time for determining foreseeability differs, depending on whether the determination concerns the scope of the physician's duty to warn or the consequences proximately caused by a breach of that duty. *See Kuzmicz v. Ivy Hill Park Apartments, Inc.,* 147 *N.J.* 510, 532–33, 688 *A.*2d 1018 (1997) (Stein, J., dissenting); *Hill v. Yaskin,* 75 *N.J.* 139, 143, 380 *A.*2d 1107 (1977). *Compare Restatement (Second) of Torts, supra,* § 289 (requiring actor to recognize risk of conduct based on knowledge then possessed or imputed to be possessed), *with id.* § 435 (actor's conduct not legal cause of harm if, in hindsight, it appears "highly

extraordinary" that the conduct should have brought about the harm). When considering the scope of a duty, the focus is on the level of knowledge existing at the time of treatment. *See id.* § 289. If, for example, medical knowledge at the time of treatment indicates that a warning is appropriate, the doctor is bound to give the warning. "Foresight, not hindsight, is the standard by which one's duty of care is to be judged." 57A *Am.Jur.2d Negligence* § 136 (1989); *see also Lewis v. American Cyanamid Co.,* 155 *N.J.* 544, 565–66, 572–75, 715 *A.*2d 967 (1998) (stating that duty of manufacturer to use fire-retardant propellant, later banned for causing ozone depletion, is to be determined considering what was known at time of manufacture).

The role of foreseeability in the analysis of proximate cause, however, is determined by looking back, with full knowledge of all that has transpired since the breach of duty. Thus, an actor's conduct is not the proximate cause of harm "where after the event and looking back from the harm to the actor's negligent conduct, it appears ... highly extraordinary that it should have brought about the harm." *Restatement (Second) of Torts, supra,* § 435; *see also Basten v. United States,* 848 *F.Supp.* 962 (N.D.Ala.1994) (finding no proximate cause in failure to warn when warning subsequently omitted from PDR).

The medical profession knows now, as distinguished from what some believed in 1991, that Provera does not cause limb reduction defects. Furthermore, the PDR no longer warns that Provera may cause those defects. Indeed, the Canesis' own experts no longer warn their patients about limb reduction defects. As a matter of law, the defects cannot be considered the foreseeable result of the doctors' failure to warn. The doctors should not be held liable for medical expenses arising from those defects. By conflating the role of foreseeability in determining the physician's duty to warn with its role in determining causation, the majority imposes liability for an injury unrelated to the breach of the doctor's duty to the patient.

According to the majority,

> The appropriate proximate cause question ... is not whether the doctor's negligence caused the fetal defect; the congenital harm suffered by the child is expressly not compensable. Rather, the determination to be made is whether the doctors' inadequate disclosure deprived the parents of their deeply personal right to decide for themselves whether to give birth to a child who could possibly be afflicted with a physical abnormality.
>
> [*Ante* at 515, 730 *A.*2d at 818.]

That conclusion redefines the risk posed by a physician's duty so that the physician is subject to liability not only for defects related to the physician's failure to warn, but for all defects, whether related or not.

Until now, the absence of a causal connection between a prescribed drug and subsequent injury would preclude a claim against the physician in both informed consent and wrongful birth actions. "An unrevealed risk that should have been made known must materialize, for otherwise the omission, however unpardonable, is legally without consequence.... Negligence unrelated to injury is nonactionable." *Canterbury, supra,* 464 *F.*2d at 790. By creating a cause of action for defects unrelated to the doctor's omission, the majority eliminates the requirement that the resulting injury be precisely the one about which the physician failed to warn.

The result is that the majority has constituted physicians virtual insurers of the health of every baby born to women whom they fail to warn of all relevant risks. Miss any warning and the physician runs the risk of liability for any defect, even if unconnected with the omitted warning. Everything that follows from the child's birth is "caused by" the doctor's negligence. Despite its protestation to the contrary, *ante* at 514, 730 *A.*2d at 817, the majority has eliminated proximate cause and reconstituted but-for cause as the basis for the imputation of liability. By imposing liability in the absence of proximate cause, the majority strays beyond the limits established in this or any other jurisdiction.

Justice O'Hern's concurring opinion makes explicit the flaws that in the majority opinion are implicit. Both opinions conflate

the effect of a failure to warn in determining a breach of duty of care with its effect in determining causation. Proximate cause, according to the concurrence, is established not because Provera caused limb reduction defects, but because the risk and the defects were "parallel." Only by eliminating proximate cause can the concurrence sustain its position that "[t]his case is about the occurrence of one of the very risks about which there was a legal duty to warn." *Ante* at 520, 730 *A*.2d at 821 (O'Hern, J., concurring). The risk about which the doctors had a duty to warn was limb reduction defects caused by Provera, not limb reduction defects from unknown causes. The defect that occurred was not caused by Provera. The risk of that defect, therefore, was not "one of the very risks about which there was a legal duty to warn." *Ibid.* The risk that "eventuated" was a birth defect caused not by Provera, but by something else, unrelated to the doctors' breach of duty. Until today, a wrongful birth action required proof of more than a breach of duty and a birth defect. The additional element was proximate cause.

The concurrence's confusion of duty and causation is made manifest by its emphasis that although

> [i]t may be that science is unable to establish to a reasonable degree of medical certainty that Provera was the cause in fact of Brandon's condition[, t]hat does not detract from the reality that the risk was one about which the patient should have been warned and was the risk that eventuated.
>
> [*Id.* at 519, 730 *A*.2d at 820.]

Assuming that the doctors' failure to warn that Provera could cause limb reduction defects constituted a breach of their duty of care, the point remains that to establish a cause of action, plaintiffs must prove that Provera caused the defect.

The concurrence acknowledges that "[w]e would not sustain a cause of action, for example, if Brandon had been born with a hereditary hip dislocation, a condition totally unrelated to the unwarned risk." *Id.* at 518–19, 730 *A*.2d at 820. The reason that the concurrence would not impose liability is that Provera does not cause hip dislocations. Medical science, including plaintiffs' experts, now accepts that Provera does not cause limb reduction

defects. The PDR's former warning of the risk of such defects, even if relevant on the issue of the doctors' duty to warn, should not suffice, in light of current medical knowledge, to establish causation. If proximate cause is to remain an element of the cause of action, the failure to warn should not lead to the imposition of liability for limb reduction defects any more than it should for the hypothetical hip dislocation.

Apparently, the concurrence also would shift the burden of proof on causation from plaintiffs to the doctors. The concurrence states, "This case is about the occurrence of one of the very risks about which there was a legal duty to warn. It is not as though the record established that there was some other cause, genetic or environmental, that caused the defect." *Id.* at 520, 730 *A.2d* at 821. Implicit in the comment that the record does not establish another cause for the birth defect is the premise that the doctors were obligated to establish such a cause. The logic of the concurrence is that absent proof of another cause, the doctors are liable for the cause asserted by plaintiffs. Thus, the concurrence would shift the burden of proof on causation from plaintiffs to defendants.

The determination of proximate cause necessarily involves public policy considerations. *Prosser & Keeton on Torts, supra,* § 42. As Justice Handler has stated:

> In considering the standards that govern an appropriate duty of care and limitations of liability in [the context of health care], we must be especially mindful of the principles of sound public policy that are informed by perceptions of fairness and balance. We therefore insist that an immediate, close and clear involvement or connection be present between a person suffering emotional distress [the claimed injury] and the conduct of the professional health care providers whose fault has contributed to [the event that precipitated the emotional distress].
>
> [*Gendek v. Poblete,* 139 *N.J.* 291, 302, 654 *A.2d* 970 (1995).]

Identifying relevant public policy considerations is crucial when considering such sensitive claims as those for wrongful birth or wrongful life. Those claims implicate understandable compassion both for the child and for the child's parents. Accompanying that compassion is concern for the financial costs that the parents and child must bear because of the child's birth defects. Another

consideration is the woman's constitutional right to choose whether to abort a fetus or to carry it to term. A countervailing consideration is the fairness of imposing liability on a physician for a result unrelated to the physician's act. Childbearing and childbirth, moreover, pose inherent risks for both mother and child. Finally, if physicians are to ensure the birth of perfect babies, the cost of that insurance will be spread among all pregnant women. Thus, the majority opinion also implicates concerns about the undue escalation of the cost of health care. Until today, courts have struck the balance in failure-to-warn wrongful birth actions by requiring the unwarned risk to be the one that eventuates. From my perspective, that conclusion still represents the appropriate balance.

## C.

The majority suggests that both the Law Division and the Appellate Division may have failed to consider all of plaintiffs' claims. According to the majority, those courts overlooked plaintiffs' wrongful birth claim, which sought to recover only the parents' own damages, as distinct from the informed consent claim in which they sought to recover damages on Brandon's behalf for his impaired condition. *Ante* at 507–09, 730 *A*.2d at 814. Additionally, the majority contends that the lower courts may not have permitted plaintiffs to argue on grounds "not dependent on medical causation between the prescribed drug and the resulting birth defect." *Id.* at 508, 730 *A*.2d at 814.

These " 'other independent grounds of liability' " include "defendants' negligent failure to 'inform and warn' plaintiffs 'that the drug manufacturers issued clear warnings that Provera should *not* be taken during the first four months of pregnancy' and that the PDR required warnings of general 'congenital anomalies,' and that this negligence, together with other negligent acts, deprived them of the opportunity to terminate the pregnancy." *Id.* at 508, 730 *A*.2d at 814. Additionally, the majority states that plaintiffs'

attorney "expressly argued" that by neglecting to warn Melissa Canesi, the doctors " 'didn't give her a chance' " to evaluate all the possible detrimental effects that could result from taking Provera. *Ibid.* The majority's concerns reflect a tortured reading of the record.

Plaintiffs' attorney acknowledged to the trial court that he had " 'some big problems on the causation' issue," but claimed that a causative link between Provera and Brandon's birth defect was unnecessary to plaintiffs' wrongful birth claim. *Id.* at 508–09, 730 *A.*2d at 814. The attorney contended that plaintiffs' wrongful birth claim was " '*not* the more typical case of a failure to obtain informed consent.' " *Id.* at 508, 730 *A.*2d at 814. Despite this argument, the majority insists that "the trial court did not determine whether plaintiffs' contentions based on a wrongful birth claim fell beyond the scope of defendants' motion for summary judgment and whether the evidence was sufficient to support a wrongful birth claim." *Id.* at 509, 730 *A.*2d at 814. Having made these observations, the majority determines that the case merits a fresh analysis by this Court of plaintiffs' evidence. *Id.* at 508–09, 730 *A.*2d at 814.

A close reading of the record reveals, however, that the lower courts considered all of plaintiffs' claims. In the Law Division, plaintiffs' attorney argued and the court considered each of the arguments propounded by the majority. Although plaintiffs' attorney initially labeled plaintiffs' wrongful birth claim as one for "informed consent," plaintiffs' attorney and the court understood the claim as one for wrongful birth.

To illustrate, the briefs and oral argument in the Law Division centered on the two leading wrongful birth opinions, *Berman* and *Procanik.* Additionally, plaintiffs' attorney relentlessly asserted what he described as the "lost-opportunity-to-elect-to-abort" claim. He differentiated that claim from a "typical" informed consent claim and argued that the differences, including the different damages sought, justified dispensing with proof that Provera

caused Brandon's defect. To support plaintiffs' wrongful birth claim, their attorney pointed to three potential effects of Provera: limb reduction, retention of a defective ovum, and "other abnormalities."

In dismissing the complaint, the trial court summarized plaintiffs' argument:

> The issue in this case ... is a unique issue and a very interesting issue.... [T]he arguments really have honed down to what can be read into the second basis. Mr. Valore had argued that by virtue of the contents of the 1991 PDR black box regarding Provera that ... that's sufficient to go to the jury with respect to proximate cause between the failure to warn and the birth of a child with limb reduction deficit....

Absent any supporting expert testimony, the trial court correctly found that the physicians' breach of their duty of care was not causally related to the birth defect:

> It was argued that [the case] goes to a jury because the prescribing of Provera to a pregnant woman increased the risk that if she was carrying an abnormal fetus, that such fetus would be retained rather than spontaneously aborted [defective ovum argument].... There is no testimony to that in the case.... And that brings us to the issue, which is really the heart of the argument. Number 2, that the failure to inform and warn Mrs. Canesi once they knew she was pregnant, that the taking of Provera during the early stages of her pregnancy posed potential risk to the fetus[,] thus depriving her of the opportunity to make a reasoned determination as to whether the pregnancy should be terminated or not.... That is the real issue in this case and that's the issue that gave me a lot of concern.... I view that as an argument that would extend the parameters of current and existing law or would fly in the face of current existing law. The cases that I've read cited by both parties with respect to failure to warn [including *Berman* and *Procanik*] all, without exception, involve failure to warn of risks which ultimately involve the patient suffering from one of the very risks that she was not warned about. There hasn't been one case in the reported decisions that has deviated from that concept. This would be that case.

In plaintiffs' motion for reconsideration, their attorney again differentiated wrongful birth and informed consent claims. Their attorney repeated that the omitted warnings should have included not only the possibility of limb reduction defects, but of "fetal abnormalities" in general.

Plaintiffs raised the same arguments in the Appellate Division, contending that they need not prove that Provera caused Canesi's ovum to be defective. They did not address the need to show that

an ovum was defective or that Provera caused Canesi to retain it. In this Court, plaintiffs likewise have failed to claim that Canesi's fertilized ova were defective or that Provera delayed her spontaneous abortion of one of them.

Like the trial court, the Appellate Division rejected plaintiffs' wrongful birth claim for lack of proof of proximate cause:

> [W]e are convinced that plaintiffs' cause of action cannot exist unless it is demonstrated that the undisclosed harm or risk actually occurred and that defendant's negligence was a proximate cause of the condition complained of. *We do not believe that legal acceptance of plaintiffs' theory of causation is appropriate or desirable.* Plaintiffs' theory would impose liability for a failure to warn or to obtain informed consent without regard to whether the ultimate consequence in fact related to the condition of which the doctor failed to warn or inform the patient.
>
> [295 *N.J.Super.* at 362, 685 *A*.2d 49 (emphasis added).]

The Appellate Division concluded:

> Because Brandon's deformity is not related to the drug to which the warning pertained, we hold, as a matter of law, that legal or proximate causation between the consequences of the birth and the failure to warn, resulting in a lost opportunity to abort, may not be found. To hold otherwise would lead to a multitude of tort claims based on "chance occurrences," rather than legally definable causal relationships.
>
> [*Id.* at 362–63, 685 *A*.2d 49.]

Contrary to the majority's assertion, the lower courts considered and determined all of plaintiffs' claims. Both the Law Division and the Appellate Division dismissed Canesi's wrongful birth claim because she was unable to establish that Provera had caused Brandon's birth defect.

The majority also seeks to bolster Canesi's failure-to-warn claim with other claims based on the doctors' failure to detect or diagnose Brandon's defect. That effort leads the majority to reach for evidence of "maternal indicators": spotting, the death of a fetal twin, and excessive amniotic fluid. According to the majority, those indicators suggest that defendant doctors are liable for a failure to diagnose Brandon Canesi's birth defect. *Ante* at 511 n. 5, 513 nn. 6 & 7, 730 *A*.2d at 816 n. 5, 817 nn. 6 & 7.

Plaintiffs' experts did not address the claimed "maternal indicators" in their reports. Neither did plaintiffs' attorney brief the issue in the Law Division. Plaintiffs also omitted any reference to "maternal indicators" from their brief in the Appellate Division and their petition for certification to this Court. In sum, the only argument about "maternal indicators" was a fleeting reference in the heat of oral argument in the Law Division. Until introduced by the majority, the issue was not a part of this appeal.

Reliance on the doctors' failure to detect Brandon's defects is the majority's unique contribution to plaintiffs' claim. The sole mention of plaintiffs' failure-to-detect claim, like the reference to "maternal indicators," was at oral argument in the Law Division. Plaintiffs understandably did not base their wrongful birth claim on the doctors' failure to diagnose. They could not because no expert identified a test capable of detecting Brandon Canesi's defect. As is the case with "maternal indicators," plaintiffs' petition for certification to this Court does not even mention "failure to diagnose" as a basis for liability. Instead, plaintiffs have concentrated exclusively on the doctors' failure to warn of the adverse effects of ingesting Provera.

As we have said before, "[o]rdinarily courts do not raise issues that the parties have not raised." *Office of Employee Relations v. Communications Workers,* 154 *N.J.* 98, 108, 711 *A.*2d 300 (1998) (criticizing Appellate Division's introduction of arbitrability issue on its own motion and without notice to parties). If the interests of justice demand that an omitted issue be raised, "the better practice is to permit the parties to address it." *Ibid.; cf. R. Wilson Plumbing & Heating v. Wademan,* 246 *N.J.Super.* 615, 617, 588 *A.*2d 444 (App.Div.1991) (reversing trial court's award of treble damages based on statutory violation never alleged by plaintiff). The majority should not introduce at this juncture claims that plaintiffs do not assert, the record does not support, and the lower courts never considered.

A failure-to-detect case differs fundamentally from one based on failure to warn, particularly with respect to proximate cause. The

majority nevertheless relies on a failure-to-detect case, *Keel v. Banach*, 624 *So.*2d 1022 (Ala.1993), to support its elimination of the "medical causation" aspect of proximate cause. *Ante* at 502–03, 730 *A.*2d at 811. *Keel* involved a doctor's failure to detect or diagnose genetic abnormalities. The plaintiffs' child was born with handicaps that the omitted tests would have revealed. The parents claimed that the doctor's failure to diagnose the child's defects had deprived them of the right to choose to terminate the pregnancy. The majority quotes *Keel* for the proposition:

> The nature of the tort of wrongful birth has nothing to do with whether a defendant caused the injury or harm to the child, but, rather, with whether the defendant's negligence was the proximate cause of the parents' being deprived of the option of ... making an informed and meaningful decision either to terminate the pregnancy or to give birth to a potentially defective child.

> [*Ibid.* (quoting *Keel*, *supra*, 624 *So.*2d at 1029).]

Missing from the majority's quotation, however, is the remainder of the paragraph:

> Like most of the other courts that have considered this cause of action, we hold that the parents of a genetically or congenitally defective child may maintain an action for its wrongful birth if the birth was the result of the negligent failure of the attending prenatal physician to discover and inform them of the existence of fetal defects.

> [*Keel*, *supra*, 624 *So.*2d at 1029.]

A fair reading of *Keel*, therefore, reveals that it does not eliminate the requirement of proximate cause. Instead, it applies the concept to the circumstances of a failure-to-detect action.

The flaws in plaintiffs' claim become apparent on viewing the claim as they view it, as one for failure to warn. Ultimately, the claim's expansion on the basis of "other independent grounds of liability," *ante* at 508, 730 *A.*2d at 814, must relate to plaintiffs' assertion that Provera was detrimental to Canesi's fetus or to her pregnancy. *See id.* at 506–08 & n. 4, 730 *A.*2d at 813–14 & n. 4. Brandon's only birth defect was limb reduction, which the majority concedes Provera did not cause. Plaintiffs have not demonstrated the essential relationship between Provera and the birth defect.

Consequently, the physicians' failure to warn should not expose them to liability.

The cause of action created by the majority subjects physicians to liability for failing to warn about the adverse effects of a drug that are not causally linked to the claimed birth defect. By breaking that link, the majority has unleashed a cause of action that knows no bounds.

I would affirm the judgment dismissing the wrongful birth claim.

GARIBALDI, J., joins in this dissent.

*For affirmance in part; reversal in part; remandment*—Chief Justice PORITZ and Justices HANDLER, O'HERN, STEIN, and COLEMAN—5.

*Concurring in result*—Justice O'HERN—1.

*For affirmance*—Justices POLLOCK and GARIBALDI—2.